Isaac M. Fisher, Appellant, *v.* John Haldeman, Jacob S. Haldeman, Richard J. Haldeman, and Robert J. Ross, Executors of Jacob Haldeman, deceased, and Thomas Chambers, Administrator de bonis non of Thomas Duncan, deceased.

By the laws of Pennsylvania before the Revolution, a pre-emption right to islands in the Susquehanna river could not be obtained by settlement.
The courts of that State have so decided, and this court adopts their decision.

This was an appeal from the Circuit Court of the United States for the eastern district of Pennsylvania.

The bill was filed by Fisher, a citizen of the State of Delaware, against the appellees, claiming to be the equitable owner of an island in the Susquehanna river, and alleging that the appellees had become possessed of the legal title by a series of frauds. The bill was quite voluminous, occupying upwards of seventy pages of the printed record, and then there was an amended bill of thirteen pages more. The substance of it, as well as the other branches of the case, are stated in the opinion of the court. In September, 1856, the Circuit Court dismissed the bill, and the complainant appealed to this court.

It was argued by *Mr. Fisher* for the appellant, and by *Mr. John M. Read* for the appellee.

The arguments of the respective counsel upon the point on which the decision of the court turned were as follows:

*Mr. Fisher*, in noticing the point that the islands in the Delaware and Susquehanna were reserved as the private property of the Penns, said, to meet the allegation of defendant, that the islands in the rivers were the private property of the Penns, without any warrant of appropriation.

Windmill Island, in front of Philadelphia, is noticed. This island was never surveyed for the Penns, nor for the Commonwealth.

It was applied for, July 1, 1849, by one Tatham, under the act of 1806, and Tatham now holds it. (See Jones *v.* Tatham, 8 Har., 398—410.)

The island in the Allegheny river, claimed by the parties, in the case of Hunter *v.* Howard, 10 S. and R., 243, in which his honor Judge Duncan gave the opinion of the court, was claimed and is now held under the same act of 1806.

There are more than a hundred islands in the various rivers of Pennsylvania which were never surveyed and returned for the proprietaries, under their general warrant of October 13, 1760; and all islands not so surveyed and returned before the 4th of July, 1776, were confiscated to the Commonwealth, as part of the general mass of the proprietary estate, under the fifth section of the divesting act of 1779.

Islands were treated by the proprietary Government as open to settlement and improvement long after 1760.

In the year 1770, William Dunn settled on the Great Island in the West Branch; and the island, one of the very best in the river, is held under his settlement right to this day.

. The record of his title from the land office will be submitted at the hearing, under the agreement of counsel that all papers from the land office shall be read on the appeal.

Previous to the year 1760, the proprietaries had granted many islands in the Susquehanna river on common warrants and common terms. Copies of these grants and the surveys on them are in the record.

SETTLEMENT RIGHT.—A first settler holds his allowance of land, 300 acres, against the proprietaries, the Commonwealth, and all subsequent settlers and warrantees. (Gilday *v.* Watson, 2 S. and R., 410.)

The actual settler has always been a favorite with the courts and Legislature of Pennsylvania. (Emory *v.* Spencer, 11 Harris, 271.)

Before the Revolution, a settler was entitled to take and hold 300 acres against proprietaries, warrantees, and other settlers. It was an actual, personal resident settlement, with a manifest intention of making it a place of abode, and the means of supporting a family, and continued from time to time, unless interrupted by the enemy. (Bonnet *v.* Devebaugh, 3 Binney, 184.)

The usage of the land office bound the proprietaries to grant the land to actual settlers on the usual and common terms; and should the proprietaries refuse to make the grant, chancery would enforce it. (Ibid.)

The consent of the proprietaries, in whatever way shown, was sufficient to vest an equitable title in a settler, which the courts would protect. (Sergeant's Land Law of Pennsylvania, 37.)

*Mr. Read* for the appellees:

The civil law which has pervaded continental Europe, and which took its rise in a country were there was a tideless sea, recognised all rivers as navigable which were really so; and this liberal view was adopted by the founder of Pennsylvania, whose province was intersected by large and valuable streams, some of which are a mile in breadth. This gave to the proprietary the ownership of all the larger streams of the Commonwealth, the riparian owner coming but to the low-water mark. The river includes what is in the river, whether above the water or under it. (Carson *v.* Blazer, 2 Binn., 473; Fisher *v.* Carter, 1 Wallace, jr., 70.)

This policy was early developed in the instructions given by William Penn, before he left England, to three commissioners for the settling of the colony, in which he said: "Let no islands be disposed of to anybody, but let things remain as they were, in that respect, till I come." (Hazard's An., 530.) And in after-times the proprietaries appropriated them to their own use by special warrants. Thus, from the first settlement of the country, these islands were withdrawn from appropriation. (1 Wallace, jr., 70.)

In Carson *v.* Blazer, 2 Binn, 477, decided on 2d June, 1810, Chief Justice Tilghman said: "But the common-law principle concerning rivers, even if extended to America, would not apply to such a river as the Susquehanna, which is a mile wide, and runs several hundred miles through a rich country, and which is navigable and is actually navigated by large boats. If such a river had existed in England, no such law would ever have been applied to it. Their streams, in which the tide does not ebb and flow, are small.

"But there is another objection to the adoption of this principle. The common law gives to each proprietor one-half of the river adjoining his shore; and if this doctrine is applied to the Susquehanna, every owner of the bank must own all the islands nearest to that bank—*a right never contended for.*

"The common-law principle is, in fact, that the owners of the banks have no right to the water of navigable rivers. Now, the Susquehanna is a navigable river, and therefore the owners of its banks have no such right. It is said, however, that some of the cases assert, that by navigable rivers are meant rivers in which there is no flow or reflow of the tide. This definition may be very proper in England, where there is no river of considerable importance as to navigation, which has not a flow of the tide; but it would be highly unreasonable when applied to our larger rivers, such as the Ohio, Allegheny, Delaware, Schuylkill, or Susquehanna and its branches."

William Penn, the proprietary and Governor of Pennsylvania in 1683, in speaking of the new city of Philadelphia, uses this emphatic language:

"The situation is a neck of land, and lieth between two navigable rivers, Delaware and Schuylkill, whereby it hath two fronts on the water—each a mile—and two from river to river. Delaware is a glorious river; but Schuylkill being a hundred miles boatable above the falls, and its course northeast towards the fountain of Susquehanna, that tends to the heart of the province, and both sides our own, it is like to be a great part of the settlement of this age." (Lowber's Ordinances of the City of Philadelphia, p. 289.)

In Hunter *v.* Howard, 10 Sergeant and Rawle, 245, decided on 26th September, 1823, the opinion of the court, consisting of Judges Gibson and Duncan, was delivered by Judge Duncan, who had argued the case of Carson *v.* Blazer. The court say, "Islands in the great rivers of Pennsylvania, under the provincial Government, *were never the subjects of appropriation, either by office right or settlement.* The proprietaries appropriated them to their own use by special warrants. This, from the consideration of the supposed superior nature, either from the quality of the soil, or the benefit of fisheries. *The State has pursued the same policy.* When the land office was opened, on the 8th April, 1785, for the sale of the residue of the waste lands, shortly before purchased from the natives by the State, it is provided, 'That all islands within the bed of the river Susquehanna, and of the east and west branches thereof, and of the rivers Ohio and Allegheny (and Delaware,') are excepted and reserved. And the said islands may be sold by special order of the President or Vice President, in council, *concerning*

*Fisher v. Haldeman et al.*

each of them, by public sale or otherwise, *for the best prices that can be gotten for the same* (islands,) and *all occupancy, and every survey, claim, or pretence, for holding the same islands by any other title, shall be utterly void."* (See 13th sec. act 8th April, 1785; 2 Smith's Laws of Pennsylvania, p. 322.)

"Thus," say the court, "from the first settlement of the country, we see these islands were withdrawn from appropriation at the general prices of other land, but each was to be sold as an individual would sell his own land, for the best prices. This act may be called the *Magna Charta*, the foundation of all titles to lands in that purchase."

"It has been modified with respect to islands; but still the Legislature kept in view the sale of the islands at a full and fair price, by the act of 6th March, 1793, (3 Smith's Laws, p. 93,) directing the sale of certain islands in the river Susquehanna. This act gave a pre-emption right to improvers for three years, directed the board of property to ascertain the just value, provided that the lowest price to be fixed by them shall not be less than eight dollars per acre. Then came the act of 27th January, 1806, (4 Smith's Laws, p. 206,) which gives rise to the present controversy, directing the sale of islands in the rivers Delaware, Ohio, and Allegheny. This act gives the improver the right of pre-emption for three years, and makes special provision how the value shall be ascertained: the officers of the land office shall appoint, on an application made for an island, three disinterested men, who shall value the same on their oaths, and shall certify the value to the secretary of the land office, who shall thereupon issue a warrant to such applicant, &c. The act declares that the pre-emption right shall be vested in the actual settler or improver for the term of three years; and that, after the expiration of that time, it shall be lawful for the Commonwealth to *grant such improved island* to the first who shall apply for the same, *subject to the regulations and provisions contained in the act."*

In Shrunk *v.* Schuylkill Navigation Company, 14 Sergeant and Rawle, p. 71, decided on April 10th, 1826, after argument by the ablest counsel of the day, Chief Justice Tilghman said, (p. 79,) after enumerating the principal rivers of the State, "Now, with us, it has never been supposed, from the earliest times to the present moment, that the owners of land on the bank had the right of property in the soil to the middle of the river in front of their land; because if they had, they would have a right to the islands also, contrary to universal opinion and practice. *These islands have never been open to applicants under the common terms of office, either under the proprietary or State Government, but have always been sold on special contract, and*

*for higher prices than common;* whereas, the lands on the banks of rivers have always been open to the public, on the usual terms, and at the usual prices. For a particular account of the manner in which islands have been granted, I refer to the case of Hunter *v.* Howard, 10 Sergeant and Rawle, 243.

"As for the soil over which our great rivers flow, it has never been granted to any one, either by William Penn or his successors, or the State Government."

In this very case, on the common-law side of the Circuit Court, reported in 1 Wallace, jr., Rep., p. 69, under the name of Fisher *v.* Carter, the late Judge Baldwin, one of the very ablest land lawyers in the State, held, on the 8th November, 1843, that at no time in the history of Pennsylvania, neither before October 13th, 1760, nor since, have islands in her great rivers been open to settlement on the same terms with fast land generally. They could be settled only on *agreed* terms.

The case is worthy of attentive perusal, as all the evidence contained in the present record, with the exception of some immaterial matters, was before the court, passed upon by them, and would have been settled by the jury definitively, except that the plaintiff suffered a nonsuit. Judge Baldwin's tribute to Chief Justice Tilghman is peculiarly just and appropriate. (Page 83.)

*Mr. Read* then referred to and commented upon the following cases—Johns *v.* Davidson, 4 Harris, 512, decided in 1851; Jones *v.* Tatham, 8 Harris, 398, decided in April, 1853; Sergeant's Land Laws of Pennsylvania, 193, 194; Rundle *v.* Delaware and Raritan Canal Company, 14 How., 80; 1 Wallace, jr., 274—and then traced the title of the appellees from 1760 down to the present time.

Mr. Justice GRIER delivered the opinion of the court.

The appellant filed his bill in the Circuit Court of the United States for the eastern district of Pennsylvania, claiming to be the equitable owner of an island in the Susquehanna river, containing about seven hundred acres, and praying that the respondents may be decreed to surrender to him the possession of the same, to deliver up their deeds and muniments of title, and account for the rents, issues, and profits.

In order to ascertain the questions involved in the case, it will not be necessary to give an abstract of the bill or specify the allegations of the answer. A brief statement of some of the admitted facts and charges of the bill will suffice.

It commences the history of the case with the first charter to and immigration of William Penn, the proprietor of Pennsylvania. But we do not think it necessary to go farther back

than the year 1760. In that year, the proprietors, claiming that the islands in the Susquehanna and other navigable streams were their private property, had them surveyed and returned as such.

About the year 1798, the persons under whom complainant claims were found by the agent of the proprietors in possession of the island, and claiming a right, from their long occupancy, to a pre-emption right as settlers. They had occupied parts of the island as far back as 1749 or 1750, some ten years before the proprietors had surveyed it; and though not in possession at that time, had afterwards returned. They were told by the agent for the Penns, that they had no title, and if they wanted a legal title they must purchase from the Penns, and that islands never had been subject to be taken up by settlement, as the other proprietary lands. These occupants refused or neglected or were unable to purchase; and about the year 1800, Thomas Duncan purchased from the agents of the Penns. Finding these occupants on the land, he told them they had no title; that islands had never been open to pre-emption by settlement, and that he was the purchaser from the Penns of the legal title. He demanded the possession of them, offering to pay them the value of their improvements, and for a release of their claim. They accordingly released their claim, gave up their possession, and received a consideration in money from Mr. Duncan, of about twenty shillings an acre. Mr. Duncan then took possession, and he and those claiming under him have had possession from that day to this, over fifty years.

In Pennsylvania, occupants or settlers on land are never considered as holding adversely to the proprietors, or to the State, their successor. Where the land was subject to pre-emption in favor of settlers, those who had obtained an equity by virtue of such a settlement or improvement, had a good title as against subsequent purchasers. But until they paid the purchase-money, and obtained their patent or deed from the proprietor, no length of possession authorized a presumption of the payment thereof, or of a grant as against the proprietors or State.

In order, therefore, to evade the effect of the release by the occupants, and the surrender of their possession to Mr. Duncan, who held the admitted legal bill, the bill charges:

1. That Edmund Physic and John R. Coats, the agents of the Penns, combined and conspired with Thomas Duncan to defraud the settlers of their title to this island.

2. That this fraud consisted in the assertion that "islands had never been subject to be appropriated as other proprietary

lands, by settlement or location, but were treated as the private property of the Penns, and, as such, sold by special contract only."

3. That the persons in possession, believing such to be the law, surrendered their possession and released their claim, whatever it might be, to Thomas Duncan, for the consideration of twenty shillings an acre, which was much less than the full value of the land.

4. That this representation, with regard to the custom or traditionary law of the province of Pennsylvania, was not true, and that Mr. Duncan must have known it to be so, and therefore made a false representation of the law to the settlers.

5. That the falsehood of this representation was not discovered till 1822.

6. That suits were then instituted, in which the judgments were against the title of plaintiff, in consequence of erroneous or unjust decisions of the courts.

Without noticing the objections to this bill on account of staleness, and the defence that Haldeman is a purchaser for valuable consideration without notice, it is plain that the whole foundation and superstructure of the case rests on this assumption, to wit: "That in 1749, by the law of the land, a pre-emption right to islands in the Susquehanna river could be obtained by settlement." If this be not so, the plaintiff's case falls to the ground, and the numerous other objections to this bill need not be noticed.

Now, this is a question of fact, depending on the history and traditions of the province of Pennsylvania, of which the decisions of her own courts are the best evidence, and conclusive on this court. The order of survey of 1760, by which the islands of the Susquehanna, and this among others, were appropriated to the private use of the proprietors, together with the manors reserved, is itself *prima facie* evidence that the proprietors never considered these islands as open to settlement as other lands. And this inference is fully confirmed by the instructions given by William Penn, before he left England, to the three commissioners for the settling of the colony, in which he said: "Let no islands be disposed of to anybody, but let things remain as they were, in that respect, till I come." (Hazard's An., 530.)

The State of Pennsylvania, by what was called the "divesting act," assumed, for a certain consideration, all the proprietary rights of the Penns over the colony, as distinguished from their private rights of property, and pursued the same policy which had been adopted by them as to islands in navigable rivers. The act of 18th April, 1785, orders islands in the new purchase

to be sold for the best prices that can be gotten for the same, and declares, "all occupancy and every survey, claim, or pretence for holding the same islands by any other title, shall be utterly void."

The statute thus recognised and continued the rule as it was found to have existed under the proprietary Government.

By the common law, fresh-water rivers do not come within the category of navigable rivers, and the riparian owners had a right to all the islands in the river, "*ad medium filum aquæ.*" But such has never been the law in Pennsylvania. In the case of Carson *v.* Blazer, (2 Binney, 473,) this peculiarity of the traditionary law of Pennsylvania, differing from the common law of England, was first recognised by judicial authority. The late Chief Justice Tilghman, speaking of the proprietary, says: "No doubt he retained the entire right to the river, and *of everything in the river*, in order that he might make such use of it as would be most conducive to the public benefit." And again, in Shrunk *v.* The Schuylkill Nav. Co., (14 S. and R., 79,) he remarks: "These islands have never been open to applicants under the common terms of office, either under the proprietary or State Government," and refers with approbation to the case of Hunter *v.* Howard, (10 S. and R., 243,) which decides that, "from the first settlement of the country, islands in the great rivers of Pennsylvania, under the provisional Government, were never subjects of appropriation, either by office-right or settlement." This doctrine has continued to be recognised as settled law in Pennsylvania for half a century. See Fisher *v.* Carter, (1 Wallace, p. 69;) Johns *v.* Davidson, (4 Harris, 516.) It is treated as such in the learned work of Judge Sergeant on the Land Laws of Pennsylvania, p. 193. Nor can any case be found in the reports or traditions of the bar, which varies or contradicts this uniform course of decision. It is through these sources alone that this court must seek for a solution of the question; and finding the law so established by the tribunals of the State, we are bound to acquiesce in and follow their decisions.

The decree of the Circuit Court is therefore affirmed, with costs.