## SHIVELY *v.* BOWLBY.

ERROR TO THE SUPREME COURT OF THE STATE OF OREGON.

No. 787.   Submitted December 2, 1892. — Decided March 5, 1894.

This court has jurisdiction to review by writ of error a judgment of the highest court of the State of Oregon, deciding that a donation land claim under the act of Congress of September 27, 1850, c. 76, of land bounded by tide water, passed no title or right below high water mark, as against a subsequent grant from the State.

By the common law, the title in the soil of the sea, or of arms of the sea, below high water mark, except so far as private rights in it have been acquired by express grant, or by prescription or usage, is in the King, subject to the public rights of navigation and fishing; and no one can erect a building or wharf upon it, without license.

Upon the American Revolution, the title and the dominion of the tide waters and of the lands under them vested in the several States of the Union within their respective borders, subject to the rights surrendered by the Constitution to the United States.

In the original States, by various laws and usages, the owners of lands bordering on tide waters were allowed greater rights and privileges in the shore below high water mark, than they had in England.

The new States admitted into the Union since the adoption of the Constitution have the same rights as the original States in the tide waters, and in the lands under them, within their respective jurisdictions.

The United States, upon acquiring a Territory, whether by cession from one of the States, or by treaty with a foreign country, or by discovery

1

and settlement, take the title and the dominion of lands below high water mark of tide waters for the benefit of the whole people, and in trust for the future States to be created out of the Territory.

Upon the question how far the title extends of the owner of land bounding on a river actually navigable, but above the ebb and flow of the tide, there is a diversity in the laws of the different States; but the prevailing doctrine now is that he does not, as in England, own to the thread of the stream.

The title and rights of riparian or littoral proprietors in the soil below high water mark are governed by the laws of the several States, subject to the rights granted to the United States by the Constitution.

The United States, while they hold country as a Territory, have all the powers both of national and of municipal government, and may grant, for appropriate purposes, titles or rights in the soil below high water mark of tide waters.

Congress has not undertaken, by general laws, to dispose of lands below high water mark of tide waters in a Territory; but, unless in case of some international duty or public exigency, has left the administration and disposition of the sovereign rights in such waters and lands to the control of the States, respectively, when admitted into the Union.

A donation land claim, bounded by the Columbia River, acquired under the act of Congress of September 27, 1850, c. 76, while Oregon was a Territory, passes no title or right in lands below high water mark, as against a subsequent grant from the State of Oregon, pursuant to its statutes.

THE original suit was in the nature of a bill in equity, brought June 8, 1891, by John Q. A. Bowlby and W. W. Parker against Charles W. Shively and wife, in the Circuit Court for the county of Clatsop and State of Oregon, to quiet the title to lands below high water mark in the city of Astoria. The case, as appearing by the record, was as follows:

On and before May 20, 1854, John M. Shively and wife were the owners of a donation land claim, as laid out and recorded by him under the act of Congress of September 27, 1850, c. 76, (9 Stat. 496,) commonly known as the Oregon Donation Act, embracing the then town and much of the present city of Astoria, and bounded on the north by the Columbia River.

On May 20, 1854, John M. Shively laid out and caused to be recorded a plat of that claim, not only of the land above high water mark, but also of adjacent tide lands and a portion of the bed of the Columbia River, including the lands in controversy, and divided into blocks three hundred feet square,

and separated from each other by streets thirty or sixty feet wide, some running at right angles to, and the others nearly parallel with, high water mark, the outermost of which streets were not within eight hundred feet of the ship channel.

Blocks 4 and 9 were above ordinary high water mark. Block 146 was in front of block 4, and between high and low water mark. In front of block 9 came blocks 141, 126 and 127 successively. A strip about fifty feet wide, being the southern part of block 141, was above high water mark, and the whole of the rest of that block was below high water mark and above low water mark. The line of ordinary low tide was on September 18, 1876, at the north line of that block: but on December 15, 1890, and for some time before this date, was one hundred feet north of the north line of block 127.

On February 18, 1860, John M. Shively and wife conveyed blocks 9, 126, 127 and 146, "in the town plat of Astoria, as laid out and recorded by John M. Shively," to James Welch and Nancy Welch, whose title was afterwards conveyed to the plaintiffs.

On June 2, 1864, John M. Shively laid out and caused to be recorded an additional plat, covering all the space between blocks 127 and 146 and the channel.

In 1865, the United States issued a patent to John M. Shively and wife for the donation land claim, bounded by the Columbia River.

On September 18, 1876, the State of Oregon, by its governor, secretary and treasurer, acting as the board of school land commissioners, pursuant to the statute of Oregon of October 26, 1874, (Laws of 1874, p. 76,) amending the statute of Oregon of October 28, 1872, (Laws of 1872, p. 129,) the provisions of both of which statutes are set forth in the margin,[1] (the words printed in brackets having been in the statute of 1872 only,

---

[1] An Act to provide for the sale of tide and overflowed lands on the sea shore and coast.

Whereas, in many of the bays, harbors and inlets on the sea coast of this State, the sea is annually encroaching upon the land, washing away the shores and shoaling such bays, harbors and inlets; and

and those printed in italics having been inserted in the statute of 1874,) executed to the plaintiffs a deed of all the lands lying

Whereas such encroachments can be prevented only at great expense, and by occupying and placing improvements upon the tide and overflowed lands belonging to the State; and

Whereas it is desirable that facilities and encouragement should be offered to the owners of the soil abutting upon the coast in such bays, harbors and inlets to make improvements and expenditures that will stay such encroachments:

Therefore, Be it enacted by the Legislative Assembly of the State of Oregon:

Sec. 1. That the owner or owners of any land abutting or fronting upon or bounded by the shore *of the Pacific Ocean, or* of any bay, harbor or inlet [on the sea coast of this State] *of the same, and rivers and their bays, in which the tide ebbs and flows, within this State,* shall have the right to purchase [from the State] all the tide land belonging to [the] *this* State in front of [such owner or owners] *the lands so owned:* Provided, that if valuable improvements have been made upon any of the tide lands of this State before the title to the land on the shore shall have passed from the United States, the owner of such improvements shall have exclusive right to purchase the lands so improved, extending to low water mark, for a period of [one year] *three years* from the approval of [this act] *the act to which this is amendatory; Provided, further, that the Willamette River shall not be deemed a river in which the tide ebbs and flows, within the meaning of this act, or of the act to which this act is amendatory; and the title of this State to any tide or overflowed lands upon said Willamette River is hereby granted and confirmed to the owners of the adjacent lands, or, when any such tide or overflowed lands have been sold, then in that case to the purchaser or purchasers of such tide or overflowed lands from such owner of such adjacent lands, or some previous owner thereof, as the case may be.*

Sec. 2. The officers of this State, who now are or who may hereafter be authorized to dispose of the school lands belonging to this State, are authorized, empowered and directed to sell such tide lands, upon proper application to purchase by parties hereby authorized to purchase; and all such tide lands shall be sold, and the money resulting from such sale shall be distributed, in accordance with the laws of this State, which now are or may hereafter be in force respecting the sale of the school lands of this State; Provided, that in the certificates of sale and patents for such lands the same shall be described as —— acres of tide land, or land under water belonging to this State, in front of the following described premises. (Here describe by legal subdivisions the lands in front of which said tide lands are located.)

Sec. 3. Every applicant for the purchase of tide land, under section 1 of this act, shall, with his application, present to the officer or officers, who are or shall be authorized to sell such lands, the evidences of his title to land which abuts or fronts upon or is bounded by such tide lands; and

between high water mark and low water mark in front of block 9, including all the tide land in block 141; and also a

---

before making such sale such officer or officers shall be satisfied that such applicant is the owner of such lands so fronting, abutting or bounded as aforesaid.

SEC. 4. The value of such tide lands shall be appraised at a certain sum per acre of the same, and such appraisal shall not value such lands at less than $1.25 for each acre of such land: Provided, the board having in charge the sale of said lands shall have power to set aside any appraisement on evidence taken of the true value of the same, and shall make another and true appraisement based on such evidence.

SEC. 5. If any person or persons who, at the passage of [this act] *the act of which this is amendatory* [shall be] *were* entitled [under section 1 thereof] to purchase any tide lands *under the provisions of section 1 thereof* shall not, [within twelve months from the passage of this act, make application to purchase such tide lands] *have applied for the same within three years from the passage of said act*, or, having made such application, shall have failed to prosecute the same, as provided by law, then such [lands] *land* shall be open to purchase by any other person who is a citizen and resident of the State of Oregon: Provided, that *when any application shall be made for the purchase of any such tide land by any person or persons other than the owner or owners of the land adjacent to such tide lands, or the purchaser or purchasers of such tide lands from such owner of adjacent lands, or some previous owner thereof, notice shall be given by said board to the owner or owners of such adjacent lands, and to any parties who are in possession of, or who shall have improved such tide lands in any manner, and such owner or owners of such adjacent lands, or the person in possession of such tide lands by purchase from such owner of such adjacent lands, or any previous owner thereof, or who shall have improved the same, shall have sixty days after service of such notice to make application for the purchase of such tide lands, and such application shall have preference over all others, and in case any person to whom notice is hereby required to be given cannot, after due diligence, be found, notice may be given at the cost of the applicant by publication in the state paper for four successive weeks; and all applications to purchase tide lands by the owner of adjacent lands shall be accompanied by the affidavit of the applicant, setting forth the fact that such land is not held by any other person under a deed from said applicant, or any person under whom he holds; but* this [section] *provision* shall not apply to [any] *the tide* lands abutting *upon* [or fronting on or bounded by the sea shore, which are] *lands* owned by the United States: [And] provided further, that if the United States *has parted or* shall [hereafter] part with its title to any lands of which, at the passage of [this act] *the act of which this is amendatory* it [is] *was* the owner, [fronting or abutting upon or bounded by the sea shore,] the grantee of such lands shall have [twelve months] *three years* after perfecting his title from the United States to apply for [the] *all* tide lands in front thereof *which may be owned by the State,*

deed of all the tide lands in block 146; but never executed to any one a deed of any tide lands north of block 146.

The plaintiffs afterwards held possession of the lands so conveyed to them, and maintained a wharf in front of block 127, which extended several hundred feet into the Columbia River, and at which ocean and river craft were wont to receive and discharge freight.

On December 15, 1890, John M. Shively, having acquired whatever title his wife still had in the lands in controversy, conveyed all his right, title and interest therein to the defendant Charles W. Shively.

---

and, in case of his failure to make such application within said period of [twelve months] *three years*, or, having made such application, [in case of his failure] *shall fail* to prosecute the same [as provided by] *according to* law, such tide [lands] *land* shall be open to purchase by any other person who is a citizen and resident of the State of Oregon.

SEC. 6. Nothing in this act provided shall prevent the Legislature of this State, or the corporate authorities of any city or town thereof, from regulating the building of wharves or other improvements in any bay, harbor or inlet of this State; and nothing in this act provided shall be construed as a grant of an exclusive right to any person or persons to use the natural oyster beds of this State; but the grantee of any land in this State, under this act, shall hold the same subject to the easement of the public, as provided by the existing laws of this State, to enter thereupon and remove, under the provisions and restrictions of the laws of this State, oysters and other shell fish therefrom.

SEC. 7. All applicants to purchase lands under the provisions of this act shall, at their own expense, cause the same to be surveyed by the county surveyor of the county in which such lands are situated, such survey to conform to and connect with the surveys of the United States adjoining, as far as may be practicable; and the certificate of the county surveyor, describing the lands applied for by metes and bounds and designating the quantity thereof, shall be forwarded under the certificate of appraisement to the officers of the State who are authorized to sell the same.

SEC. 8. Inasmuch as there is no law upon this subject at the present time, this act shall take effect from and after its passage.

The act of 1874 contains two additional sections, the one providing that *the title to all tide lands heretofore sold, and for which conveyances have already been executed, under the provisions of the act to which this is amendatory, be and the same is hereby confirmed unto the purchasers thereof;* and the other providing that, *inasmuch as the existing law does not authorize the sale of tide lands lying on the ocean beach and the rivers and bays thereof, this act shall take effect and be in force from and after its approval by the Governor.*

On April 7, 1891, the defendants, pretending to act under the statute of Oregon of February 18, 1891, (Laws of 1891, p. 594,) executed and recorded an instrument dedicating to the public their interest in some of the streets adjacent to these lands.

The plaintiffs claimed, under the deeds from the State of Oregon, the title in all the tide lands on the west half of block 141, on all of blocks 126 and 127 and north thereof, and on the west half of block 146 and north thereof, between the lines of low and ordinary high tide of the Columbia River; and also claimed all the wharfing rights and privileges in front thereof to the ship channel; and prayed that the cloud created by the defendants' instrument of dedication might be removed, and the defendants be adjudged to have no title or right in the premises, and for further relief.

The defendants denied any title or right in the plaintiffs, except in the west half of block 146; and, by counter-claim, in the nature of a cross bill, stating the facts above set forth, asserted that, under the patent from the United States to John M. Shively, and his deed to Charles W. Shively, the latter was the owner in fee simple of so much of the east half of block 141 as was above high water mark, and of all the tide lands and riparian and wharfing rights in front thereof to the channel, excepting blocks 126 and 127; and was also the owner of all the riparian and wharfing rights in front of block 4 to the channel, excepting block 146; and contended that the first deed from the State of Oregon to the plaintiffs conveyed no title in that part of block 141 above high water mark, or in any tide lands, and that John M. Shively's conveyance of specific blocks by reference to his plat passed no wharfing rights in front thereof; and prayed that Charles W. Shively might have possession of said premises, and damages against the plaintiffs for withholding the same, and further relief.

The court sustained a demurrer of the plaintiffs to the counter-claim, (except as to that part of block 141 above high water mark,) and dismissed that claim; and then, on motion of the plaintiffs, dismissed their suit, without prejudice to their interest in the subject thereof.

The defendant Charles W. Shively appealed to the Supreme Court of the State, which affirmed the judgment, upon the ground that the grant from the United States, bounded by the Columbia River, passed no title or right in lands below high water mark, as against the subsequent deeds from the State of Oregon. 22 Oregon, 410.

The said defendant thereupon sued out this writ of error, and assigned the following errors:

"First. The Supreme Court of Oregon decided that a grantee of the United States, under the act of Congress of September 27, 1850, known as the Oregon Donation Land Law, of land bounded by the tidal navigable waters of the Columbia River, obtained by virtue of said grant no exclusive access to the channel of said river, and no wharfage rights below ordinary high tide of said river in front of said high land."

"Second. The Supreme Court of Oregon decided that said State was the absolute owner of all rights in front of the high land granted by the United States to said grantee, with said Columbia River as a boundary, below the meander line, out to the channel of said Columbia River, to the exclusion of all rights of the grantee aforesaid of the United States, under the said act of Congress of September 27, 1850."

"Third. The Supreme Court of Oregon decided that said State had the absolute power to dispose of the soil of said river and of all wharfage rights in front of the high land granted by the United States to said grantee, the predecessor of the plaintiff in error, with said Columbia River as a boundary, to a private person for a private beneficial use, and had so disposed of the same to the defendants in error."

*Mr. A. H. Garland, Mr. John F. Dillon,* and *Mr. Sidney Dell* for plaintiff in error.

*Mr. J. N. Dolph* for defendants in error.

MR. JUSTICE GRAY, after stating the case, delivered the opinion of the court.

This case concerns the title in certain lands below high water mark in the Columbia River in the State of Oregon; the defendant below, now plaintiff in error, claiming under the United States, and the plaintiffs below, now defendants in error, claiming under the State of Oregon ; and is in substance this : James M. Shively, being the owner, by title obtained by him from the United States under the act of Congress of September 27, 1850, c. 76, while Oregon was a Territory, of a tract of land in Astoria, bounded north by the Columbia River, made a plat of it, laying it out into blocks and streets, and including the adjoining lands below high water mark; and conveyed four of the blocks, one above and three below that mark, to persons who conveyed to the plaintiffs. The plaintiffs afterwards obtained from the State of Oregon deeds of conveyance of the tide lands in front of these blocks, and built and maintained a wharf upon part of them. The defendant, by counter-claim, asserted a title, under a subsequent conveyance from Shively, to some of the tide lands, not included in his former deeds, but included in the deeds from the State.

The counter-claim, therefore, depended upon the effect of the grant from the United States to Shively of land bounded by the Columbia River, and of the conveyance from Shively to the defendant, as against the deeds from the State to the plaintiffs. The Supreme Court. of Oregon, affirming the judgment of a lower court of the State, held the counter-claim to be invalid, and thereupon, in accordance with the state practice, gave leave to the plaintiffs to dismiss their complaint, without prejudice. Hill's Code of Oregon, §§ 246, 393.

The only matter adjudged was upon the counter-claim. The judgment against its validity proceeded upon the ground that the grant from the United States upon which it was founded passed no title or right, as against the subsequent deeds from the State, in lands below high water mark. This is a direct adjudication against the validity of a right or privilege claimed under a law of the United States, and presents a Federal question within the appellate jurisdiction of

this court. Rev. Stat. § 709. That jurisdiction has been repeatedly exercised, without objection or doubt, in similar cases of writs of error to the state courts. *Railroad Co.* v. *Schurmeir,* 7 Wall. 272; *Packer* v. *Bird,* 137 U. S. 661; *Knight* v. *United States Land Association,* 142 U. S. 161.

It was argued for the defendants in error that the question presented was a mere question of construction of a grant bounded by tide water, and would have been the same as it is if the grantor had been a private person. But this is not so. The rule of construction in the case of such a grant from the sovereign is quite different from that which governs private grants. The familiar rule and its chief foundation were felicitously expressed by Sir William Scott: "All grants of the Crown are to be strictly construed against the grantee, contrary to the usual policy of the law in the consideration of grants; and upon this just ground, that the prerogatives and rights and emoluments of the Crown being conferred upon it for great purposes, and for the public use, it shall not be intended that such prerogatives, rights and emoluments are diminished by any grant, beyond what such grant by necessary and unavoidable construction shall take away." *The Rebeckah,* 1 C. Rob. 227, 230. Many judgments of this court are to the same effect. *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 544–548; *Martin* v. *Waddell,* 16 Pet. 367, 411; *Central Transportation Co.* v. *Pullman's Car Co.,* 139 U. S. 24, 49.

In *Yesler* v. *Washington Harbor Commissioners,* at the last term, in which the writ of error was dismissed for want of jurisdiction, it did not appear that the plaintiff in error claimed under a grant from the United States. 146 U. S. 646, 653, 654.

The present case being clearly within our jurisdiction, we proceed to the consideration of its merits.

The briefs submitted to the court in the case at bar, as well as in *Yesler* v. *Washington Harbor Commissioners,* above cited, and in *Prosser* v. *Northern Pacific Railroad,* (which now stands for judgment,) have been so able and elaborate, and have disclosed such a diversity of view as to the scope

and effect of the previous decisions of this court upon the subject of public and private rights in lands below high water mark of navigable waters, that this appears to the court to be a fit occasion for a full review of those decisions and a consideration of other authorities upon the subject.

I. By the common law, both the title and the dominion of the sea, and of rivers and arms of the sea, where the tide ebbs and flows, and of all the lands below high water mark, within the jurisdiction of the Crown of England, are in the King. Such waters, and the lands which they cover, either at all times, or at least when the tide is in, are incapable of ordinary and private occupation, cultivation and improvement; and their natural and primary uses are public in their nature, for highways of navigation and commerce, domestic and foreign, and for the purpose of fishing by all the King's subjects. Therefore the title, *jus privatum*, in such lands, as of waste and unoccupied lands, belongs to the King as the sovereign; and the dominion thereof, *jus publicum*, is vested in him as the representative of the nation and for the public benefit.

The great authority in the law of England upon this subject is Lord Chief Justice Hale, whose authorship of the treatise *De Jure Maris*, sometimes questioned, has been put beyond doubt by recent researches. Moore on the Foreshore, (3d ed.) 318, 370, 413.

In that treatise, Lord Hale, speaking of "the King's right of propriety or ownership in the sea and soil thereof" within his jurisdiction, lays down the following propositions: "The right of fishing in this sea and the creeks and arms thereof is originally lodged in the Crown, as the right of depasturing is originally lodged in the owner of the waste whereof he is lord, or as the right of fishing belongs to him that is the owner of a private or inland river." "But though the King is the owner of this great waste, and as a consequent of his propriety hath the primary right of fishing in the sea and the creeks and arms thereof; yet the common people of England have regularly a liberty of fishing in the sea or creeks or arms thereof, as a public common of piscary, and may not without

injury to their right be restrained of it, unless in such places, creeks or navigable rivers, where either the King or some particular subject hath gained a propriety exclusive of that common liberty." "The shore is that ground that is between the ordinary high water and low water mark. This doth *prima facie* and of common right belong to the King, both in the shore of the sea and the shore of the arms of the sea." Hargrave's Law Tracts, 11, 12. And he afterwards explains: "Yet they may belong to the subject in point of propriety, not only by charter or grant, whereof there can be but little doubt, but also by prescription or usage." "But though the subject may thus have the propriety of a navigable river part of a port, yet these cautions are to be added, viz." "2d. That the people have a public interest, a *jus publicum*, of passage and repassage with their goods by water, and must not be obstructed by nuisances." "For the *jus privatum* of the owner or proprietor is charged with and subject to that *jus publicum* which belongs to the King's subjects; as the soil of an highway is, which though in point of property it may be a private man's freehold, yet it is charged with a public interest of the people, which may not be prejudiced or damnified." pp. 25, 36.

So in the second part, *De Portibus Maris*, Lord Hale says that "when a port is fixed or settled by" "the license or charter of the King, or that which presumes and supplies it, viz. custom and prescription;" "though the soil and franchise or dominion thereof *prima facie* be in the King, or by derivation from him in a subject; yet that *jus privatum* is clothed and superinduced with a *jus publicum*, wherein both natives and foreigners in peace with this kingdom are interested, by reason of common commerce, trade and intercourse." "But the right that I am now speaking of is such a right that belongs to the King *jure prerogativæ*, and it is a distinct right from that of propriety; for, as before I have said, though the dominion either of franchise or propriety be lodged either by prescription or charter in a subject, yet it is charged or affected with that *jus publicum* that belongs to all men, and so it is charged or affected with that *jus regium*, or right of preroga-

tive of the King, so far as the same is by law invested in the King." Hargrave's Law Tracts, 84, 89.

In England, from the time of Lord Hale, it has been treated as settled that the title in the soil of the sea, or of arms of the sea, below ordinary high water mark, is in the King, except so far as an individual or a corporation has acquired rights in it by express grant, or by prescription or usage; *Fitzwalter's Case,* 3 Keb. 242; *S. C.* 1 Mod. 105; 3 Shep. Ab. 97; Com. Dig. Navigation, A, B; Bac. Ab. Prerogative, B; *The King* v. *Smith,* 2 Doug. 441; *Attorney General* v. *Parmeter,* 10 Price, 378, 400, 401, 411, 412, 464; *Attorney General* v. *Chambers,* 4 D. M. & G. 206, and 4 D. & J. 55; *Malcomson* v. *O'Dea,* 10 H. L. Cas. 591, 618, 623; *Attorney General* v. *Emerson,* (1891) App. Cas. 649; and that this title, *jus privatum,* whether in the King or in a subject, is held subject to the public right, *jus publicum,* of navigation and fishing. *Attorney General* v. *Parmeter,* above cited; *Attorney General* v. *Johnson,* 2 Wilson Ch. 87, 101–103; *Gann* v. *Free Fishers of Whitstable,* 11 H. L. Cas. 192. The same law has been declared by the House of Lords to prevail in Scotland. *Smith* v. *Stair,* 6 Bell App. Cas. 487; *Lord Advocate* v. *Hamilton,* 1 Macq. 46, 49.

It is equally well settled that a grant from the sovereign of land bounded by the sea, or by any navigable tide water, does not pass any title below high water mark, unless either the language of the grant, or long usage under it, clearly indicates that such was the intention. Lord Hale, in Hargrave's Law Tracts, 17, 18, 27; *Somerset* v. *Fogwell,* 5 B. & C. 875, 885; *S. C.* 8 D. & R. 747, 755; *Smith* v. *Stair,* 6 Bell App. Cas. 487; *United States* v. *Pacheco,* 2 Wall. 587.

By the law of England, also, every building or wharf erected, without license, below high water mark, where the soil is the King's, is a purpresture, and may, at the suit of the King, either be demolished, or be seized and rented for his benefit, if it is not a nuisance to navigation. Lord Hale, in Hargrave's Law Tracts, 85; Mitf. Pl. (4th ed.) 145; *Blundell* v. *Catterall,* 5 B. & Ald. 268, 298, 305; *Attorney General* v. *Richards,* 2 Anstr. 603, 616; *Attorney General* v. *Parmeter,* 10 Price, 378, 411, 464; *Attorney General* v. *Terry,* L. R. 9 Ch. 425, 429,

note; *Weber* v. *Harbor Commissioners*, 18 Wall. 57, 65; *Barney* v. *Keokuk*, 94 U. S. 324, 337.

By recent judgments of the House of Lords, after conflicting decisions in the courts below, it has been established in England, that the owner of land fronting on a navigable river in which the tide ebbs and flows has a right of access from his land to the river; and may recover compensation for the cutting off of that access by the construction of public works authorized by an act of Parliament which provides for compensation for "injuries affecting lands," "including easements, interests, rights and privileges in, over or affecting lands." The right thus recognized, however, is not a title in the soil below high water mark, nor a right to build thereon, but a right of access only, analogous to that of an abutter upon a highway. *Buccleuch* v. *Metropolitan Board of Works*, L. R. 5 H. L. 418; *Lyon* v. *Fishmongers Co.*, 1 App. Cas. 662. "That decision," said Lord Selborne, "must be applicable to every country in which the same general law of riparian rights prevails, unless excluded by some positive rule or binding authority of the *lex loci.*" *North Shore Railway* v. *Pion*, 14 App. Cas. 612, 620, affirming 14 Canada Sup. Ct. 677.

II. The common law of England upon this subject, at the time of the emigration of our ancestors, is the law of this country, except so far as it has been modified by the charters, constitutions, statutes or usages of the several Colonies and States, or by the Constitution and laws of the United States.

The English possessions in America were claimed by right of discovery. Having been discovered by subjects of the King of England, and taken possession of in his name, by his authority or with his assent, they were held by the King as the representative of and in trust for the nation; and all vacant lands, and the exclusive power to grant them, were vested in him. The various charters granted by different monarchs of the Stuart dynasty for large tracts of territory on the Atlantic coast conveyed to the grantees both the territory described and the powers of government, including the property and the dominion of lands under tide waters. And upon the Ameri-

can Revolution, all the rights of the Crown and of Parliament vested in the several States, subject to the rights surrendered to the national government by the Constitution of the United States. *Johnson* v. *McIntosh*, 8 Wheat. 543, 595; *Martin* v. *Waddell*, 16 Pet. 367, 408–410, 414; *Commonwealth* v. *Roxbury*, 9 Gray, 451, 478–481; *Stevens* v. *Paterson & Newark Railroad*, 5 Vroom, (34 N. J. Law,) 532; *People* v. *New York & Staten Island Ferry*, 68 N. Y. 71.

The leading case in this court, as to the title and dominion of tide waters and of the lands under them, is *Martin* v. *Waddell*, (1842,) 16 Pet. 367, which arose in New Jersey, and was as follows: The charters granted by Charles II. in 1664 and 1674 to his brother the Duke of York (afterwards James II.) included New York and New Jersey and the islands of Martha's Vineyard and Nantucket, and conveyed to the Duke the territories therein described, "together with all the lands, islands, soils, rivers, harbors, mines, minerals, quarries, woods, marshes, waters, lakes, fishings, hawkings, huntings and fowling, and all other royalties, profits, commodities and hereditaments," thereto belonging or appertaining, and all the "estate, right, title, interest, benefit, advantage, claim and demand" of the King, of, in or to the same; as well as full powers of government: provided, however, that all statutes, ordinances and proceedings should not be contrary to, but, as near as conveniently might be, agreeable to the laws, statutes and government of England. All these rights, both of property and of government, in a part of those territories, were granted by the Duke of York to the Proprietors of East Jersey; and they, in 1702, surrendered to Queen Anne all "the powers, authorities and privileges of and concerning the government of" the Province, retaining their rights of private property. Leaming and Spicer's New Jersey Grants, 4, 5, 42, 43, 148, 149, 614, 615. An action of ejectment was brought in the Circuit Court of the United States for the District of New Jersey, for land under tide waters in Raritan Bay and River, to which the plaintiff claimed title under specific conveyances of that land from the Proprietors of East Jersey, and of which the defendants were in possession, for the purpose of

planting and growing oysters, under a statute passed by the legislature of the State of New Jersey in 1824.

This court, following, though not resting wholly upon, the decision of the Supreme Court of New Jersey in *Arnold* v. *Mundy*, 1 Halsted, (6 N. J. Law,) 1, gave judgment for the defendants, for reasons assigned in the opinion delivered by Chief Justice Taney, which cannot be better summed up than in his own words: "The country mentioned in the letters patent was held by the King in his public and regal character as the representative of the nation, and in trust for them." 16 Pet. 409. By those charters, in view of the principles stated by Lord Hale, in the passage above quoted concerning the right of fishing, "the dominion and propriety in the navigable waters, and in, the soils under them, passed, as a part of the prerogative rights annexed to the political powers conferred on the Duke;" and "in his hands they were intended to be a trust for the common use of the new community about to be established" — " a public trust for the benefit of the whole community, to be freely used by all for navigation and fishery, as well for shell fish as floating fish" — and not as "private property, to be parcelled out and sold by the Duke for his own individual emolument." "And in the judgment of the court, the lands under the navigable waters passed to the grantee as one of the royalties incident to the powers of government; and were to be held by him in the same manner and for the same purposes that the navigable waters of England, and the soils under them, are held by the Crown." pp. 411–413. The surrender by the proprietors in 1702 restored to the Crown all "its ordinary and well known prerogatives," including "the great right of dominion and ownership in the rivers, bays and arms of the sea, and the soils under them," "in the same plight and condition in which they originally came to the hands of the Duke of York." p. 416. "When the Revolution took place, the people of each State became themselves sovereign; and in that character hold the absolute right to all their navigable waters, and the soils under them, for their own common use, subject only to the rights since surrendered by the Constitution to the general government." p. 410.

It was in giving the reasons for holding that the royal charters did not sever the soil under navigable waters, and the public right of fishing, from the powers of government, and in speaking of the effect which grants of the title in the sea shore to others than the owner of the upland might have, not upon any peculiar rights supposed to be incident to his ownership, but upon the public and common rights in, and the benefits and advantages of, the navigable waters, which the colonists enjoyed " for the same purposes, and to the same extent, that they had been used and enjoyed for centuries in England," and which every owner of the upland therefore had in common with all other persons, that Chief Justice Taney, in the passage relied on by the plaintiff in error, observed : " Indeed, it could not well have been otherwise; for the men who first formed English settlements could not have been expected to encounter the many hardships that unavoidably attended their emigration to the New World, and to people the banks of its bays and rivers, if the land under the water at their very doors was liable to immediate appropriation by another, as private property ; and the settler upon the fast land thereby excluded from its enjoyment, and unable to take a shell fish from its bottom, or fasten there a stake, or even bathe in its waters, without becoming a trespasser upon the rights of another." 16 Pet. 414.

The full extent of that decision may be more clearly appreciated by referring to the dissenting opinion of Mr. Justice Thompson in that case, and to the unanimous judgment of the court in the subsequent case of *Den* v. *Jersey Co.*, (1853,) 15 How. 426.

In *Martin* v. *Waddell*, Mr. Justice Thompson unavailingly contended that the title in the lands under the navigable tide water, the *jus privatum*, as distinguished from the *jus publicum*, passed as private property from the King to the Duke, and from him to the Proprietors of East Jersey, and was unaffected by their surrender to Queen Anne, and therefore passed from them to the plaintiff, subject indeed to the public rights of navigation, passing and repassing, and perhaps of fishery for floating fish, but not to the right of planting,

growing and dredging oysters; and also that, if the King held this land as trustee for the common benefit of all his subjects, and inalienable as private property, the State of New Jersey, on succeeding to his rights at the Revolution, could not hold it discharged of the trust, and dispose of it to the private and exclusive use of individuals.   16 Pet. 418–434.

In *Den* v. *Jersey Co.*, which was ejectment for land under tide water, that had been reclaimed and occupied as building lots by a corporation, pursuant to an act of the legislature of the State of New Jersey, the plaintiff, claiming under a conveyance from the Proprietors of East Jersey, contended that the fee of the soil under the navigable waters of that part of the State was conveyed to the Proprietors as private property, subject to the public use; that, the public use having ceased as to the land in question, they were entitled to the exclusive possession; and that nothing but the right of fishery was decided in *Martin* v. *Waddell*. But the court, again speaking by Chief Justice Taney, held that the decision in *Martin* v. *Waddell*, being in ejectment, necessarily determined the title to the soil, and governed this case; and therefore gave judgment for the grantee of the State, and against the claimant under the Proprietors. 15 How. 432, 433.

III. The governments of the several Colonies, with a view to induce persons to erect wharves for the benefit of navigation and commerce, early allowed to the owners of lands bounding on tide waters greater rights and privileges in the shore below high water mark, than they had in England. But the nature and degree of such rights and privileges differed in the different Colonies, and in some were created by statute, while in others they rested upon usage only.

In Massachusetts, by virtue of an ancient colonial enactment, commonly called the Ordinance of 1641, but really passed in 1647, and remaining in force to this day, the title of the owner of land bounded by tide water extends from high water mark over the shore or flats to low water mark, if not beyond one hundred rods. The private right thus created in the flats is not a mere easement, but a title in fee,

which will support a real action, or an action of trespass *quare clausum fregit,* and which may be conveyed by its owner with or without the upland; and which he may build upon or enclose, provided he does not impede the public right of way over it for boats and vessels. But his title is subject to the public rights of navigation and fishery; and therefore, so long as the flats have not been built upon or enclosed, those public rights are not restricted or abridged; and the State, in the exercise of its sovereign power of police for the protection of harbors and the promotion of commerce, may, without making compensation to the owners of the flats, establish harbor lines over those flats, beyond which wharves shall not thereafter be built, even when they would be no actual injury to navigation. Mass. Colony Laws, (ed. 1660,) 50; (ed. 1872,) 90, 91; *Boston* v. *Lecraw,* 17 How. 426, 432, 433; *Richardson* v. *Boston,* 19 How. 263, and 24 How. 188; *Commonwealth* v. *Alger,* 7 Cush. 53, 67–81. It is because of the ordinance vesting the title in fee of the flats in the owner of the upland, that a conveyance of his land bounding on the tide water, by whatever name, whether "sea," "bay," "harbor" or "river," has been held to include the land below high water mark as far as the grantor owns. *Boston* v. *Richardson,* 13 Allen, 146, 155, and 105 Mass. 351, 355, and cases cited. As declared by Chief Justice Shaw, grants by the Colony of Massachusetts, before the ordinance, of lands bounded by tide water did not include any land below high water mark. *Commonwealth* v. *Alger,* 7 Cush. 53, 66; *Commonwealth* v. *Roxbury,* 9 Gray, 451, 491–493. See also *Litchfield* v. *Scituate,* 136 Mass. 39. The decision in *Manchester* v. *Massachusetts,* 139 U. S. 240, affirming 152 Mass. 230, upheld the jurisdiction of the State, and its authority to regulate fisheries, within a marine league from the coast.

The rule or principle of the Massachusetts ordinance has been adopted and practised on in Plymouth, Maine, Nantucket and Martha's Vineyard, since their union with the Massachusetts Colony under the Massachusetts Province Charter of 1692. *Commonwealth* v. *Alger,* 7 Cush. 53, 76, and other authorities collected in 9 Gray, 523.

In New Hampshire, a right in the shore has been recognized to belong to the owner of the adjoining upland, either by reason of its having once been under the jurisdiction of Massachusetts, or by early and continued usage. *Nudd* v. *Hobbs*, 17 N. H. 524, 526; *Clement* v. *Burns*, 43 N. H. 609, 621; *Concord Co.* v. *Robertson*, 66 N. H. 1, 26, 27.

In Rhode Island, the owners of land on tide water have no title below high water mark; but by long usage, apparently sanctioned by a colonial statute of 1707, they have been accorded the right to build wharves or other structures upon the flats in front of their lands, provided they do not impede navigation, and have not been prohibited by the legislature; and they may recover damages against one who, without authority from the legislature, fills up such flats so as to impair that right. Angell on Tide Waters, (2d ed.) 236, 237; *Folsom* v. *Freeborn*, 13 R. I. 200, 204, 210. It would seem, however, that the owner of the upland has no right of action against any one filling up the flats by authority of the State for any public purpose. *Gerhard* v. *Seekonk Commissioners*, 15 R. I. 334; *Clark* v. *Providence*, 16 R. I. 337.

In Connecticut, also, the title in the land below high water mark is in the State. But by ancient usage, without any early legislation, the proprietor of the upland has the sole right, in the nature of a franchise, to wharf out and occupy the flats, even below low water mark, provided he does not interfere with navigation; and this right may be conveyed separately from the upland; and the fee in flats so reclaimed vests in him. *Ladies' Seamen's Friend Society* v. *Halstead*, 58 Conn. 144, 150–152; *Prior* v. *Swartz*, 62 Conn. 132, 136–138. The exercise of this right is subject to all regulations the State may see fit to impose, by authorizing commissioners to establish harbor lines, or otherwise. *State* v. *Sargent*, 45 Conn. 358. But it has been intimated that it cannot be appropriated by the State to a different public use, without compensation. *Farist Co.* v. *Bridgeport*, 60 Conn. 278.

In New York, it was long considered as settled law that the State succeeded to all the rights of the Crown and Par-

liament of England in lands under tide waters, and that the owner of land bounded by a navigable river within the ebb and flow of the tide had no private title or right in the shore below high water mark, and was entitled to no compensation for the construction, under a grant from the legislature of the State, of a railroad along the shore between high and low water mark, cutting off all access from his land to the river, except across the railroad. *Lansing* v. *Smith*, 4 Wend. 9, 21; *Gould* v. *Hudson River Railroad*, 6 N. Y. 522; *People* v. *Tibbetts*, 19 N. Y. 523, 528; *People* v. *Canal Appraisers*, 33 N. Y. 461, 467; *Langdon* v. *New York*, 93 N. Y. 129, 144, 154–156; *New York* v. *Hart*, 95 N. Y. 443, 450, 451, 457; *In re Staten Island Rapid Transit Co.*, 103 N. Y. 251, 260. The owner of the upland has no right to wharf out, without legislative authority; and titles granted in lands under tide water are subject to the right of the State to establish harbor lines. *People* v. *Vanderbilt*, 26 N. Y. 287, and 28 N. Y. 396; *People* v. *New York & Staten Island Ferry*, 68 N. Y. 71. The law of that State, as formerly understood, has been recently so far modified as to hold — in accordance with the decision in *Buccleuch* v. *Metropolitan Board of Works*, L. R. 5 H. L. 418, and contrary to the decisions in *Gould* v. *Hudson River Railroad*, above cited, and in *Stevens* v. *Paterson & Newark Railroad*, 5 Vroom, (34 N. J. Law,) 532 — that the owner of land bounded by tide water may maintain an action against a railroad corporation constructing its road by authority of the legislature so as to cut off his access to the water. *Williams* v. *New York*, 105 N. Y. 419, 436; *Kane* v. *New York Elevated Railroad*, 125 N. Y. 164, 184; *Rumsey* v. *New York & New England Railroad*, 133 N. Y. 79, and 136 N. Y. 543.

The law of New Jersey upon this subject was recognized and clearly stated in a recent judgment of this court, in which a grant by commissioners under a statute of the State to a railroad corporation, of a tract of land below high water mark, was held to preclude a city from continuing over the flats a highway dedicated to the public by the owner of the upland. "In the examination of the effect to be given to

the riparian laws of the State of New Jersey," said Mr. Justice Matthews, speaking for the court, "it is to be borne in mind that the lands below high water mark, constituting the shores and submerged lands of the navigable waters of the State, were, according to its laws, the property of the State as sovereign. Over these lands it had absolute and exclusive dominion, including the right to appropriate them to such uses as might best serve its views of the public interest, subject to the power conferred by the Constitution upon Congress to regulate foreign and interstate commerce. The object of the legislation in question was evidently to define the relative rights of the State, representing the public sovereignty and interest, and of the owners of land bounded by high water mark." "The nature of the title in the State to lands under tide water was thoroughly considered by the Court of Errors and Appeals of New Jersey in the case of *Stevens* v. *Paterson & Newark Railroad*, 5 Vroom, (34 N. J. Law,) 532. It was there declared (p. 549) 'that all navigable waters within the territorial limits of the State, and the soil under such waters, belong in actual propriety to the public; that the riparian owner, by the common law, has no peculiar rights in this public domain as incidents of his estate; and that the privileges he possesses by the local custom or by force of the wharf act, to acquire such rights, can, before possession has been taken, be regulated or revoked at the will of the legislature. The result is that there is no legal obstacle to a grant by the legislature to the defendants of that part of the property of the public which lies in front of the lands of the plaintiff, and which is below high water mark.' It was therefore held, in that case, that it was competent for the legislative power of the State to grant to a stranger lands constituting the shore of a navigable river under tide water, below high water mark, to be occupied and used with structures and improvements in such a manner as to cut off the access of the riparian owner from his land to the water, and that without making compensation to him for such loss." *Hoboken* v. *Pennsylvania Railroad*, (1887,) 124 U. S. 656, 688, 690, 691.

The arguments on both sides of that proposition, upon general principles, as well as under the law of New Jersey, are nowhere more strongly and fully stated than by Chief Justice Beasley delivering the opinion of the majority of the court, and by Chancellor Zabriskie speaking for the dissenting judges, in *Stevens* v. *Paterson & Newark Railroad*, above cited, decided in 1870. Two years later, Chancellor Zabriskie recognized it as settled by that case, "that the lands under water, including the shore on the tide waters of New Jersey, belong absolutely to the State, which has the power to grant them to any one, free from any right of the riparian owner in them." *Pennsylvania Railroad* v. *New York & Long Branch Railroad*, 8 C. E. Green, (23 N. J. Eq.) 157, 159. See also *New York &c. Railroad* v. *Yard*, 14 Vroom, (43 N. J. Law,) 632, 636; *American Dock Co.* v. *Trustees of Public Schools*, 12 Stewart, (39 N. J. Eq.) 409, 445.

In Pennsylvania, likewise, upon the Revolution, the State succeeded to the rights, both of the Crown and of the Proprietors, in the navigable waters and the soil under them. *Rundle* v. *Delaware & Raritan Canal*, 14 How. 80, 90; *Gilman* v. *Philadelphia*, 3 Wall. 713, 726. But by the established law of the State, the owner of lands bounded by navigable water has the title in the soil between high and low water mark, subject to the public right of navigation, and to the authority of the legislature to make public improvements upon it, and to regulate his use of it. *Tinicum Co.* v. *Carter*, 61 Penn. St. 21, 30, 31; *Wainwright* v. *McCullough*, 63 Penn. St. 66, 74; *Zug* v. *Commonwealth*, 70 Penn. St. 138; *Philadelphia* v. *Scott*, 81 Penn. St. 80, 86; *Wall* v. *Pittsburgh Harbor Co.*, 152 Penn. St. 427.

In Delaware, as has been declared by its Supreme Court, "all navigable rivers within the State belong to the State, not merely in right of eminent domain, but in actual propriety." *Bailey* v. *Philadelphia, Wilmington & Baltimore Railroad*, 4 Harrington, (Del.) 389, 395. And see *Willson* v. *Blackbird Creek Co.*, 2 Pet. 245, 251.

In Maryland, the owner of land bounded by tide water is authorized, according to various statutes beginning in 1745, to

build wharves or other improvements upon the flats in front of his land, and to acquire a right in the land so improved. *Casey* v. *Inloes*, 1 Gill, 430; *Baltimore* v. *McKim*, 3 Bland, 453; *Goodsell* v. *Lawson*, 42 Maryland, 348; *Garitee* v. *Baltimore*, 53 Maryland, 422; *Horner* v. *Pleasants*, 66 Maryland, 475; *Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.*, 109 U. S. 672, 675, 684, in which the question was who was the riparian owner, and as such entitled to wharf out into the Potomac River in the District of Columbia under the authority to do so expressly conferred under the laws of Maryland in force in the District. This court, speaking by Mr. Justice Curtis, in affirming the right of the State of Maryland to protect the oyster fishery within its boundaries, said: "Whatever soil below low water mark is the subject of exclusive propriety and ownership belongs to the State on whose maritime border and within whose territory it lies, subject to any lawful grants of that soil by the State, or the sovereign power which governed its territory before the Declaration of Independence. But this soil is held by the State, not only subject to, but in some sense in trust for, the enjoyment of certain public rights, among which is the common liberty of taking fish, as well shell fish as floating fish." *Smith* v. *Maryland*, 18 How. 71, 74.

The State of Virginia was held by this court, upon like grounds, to have the right to prohibit persons not citizens of the State from planting oysters in the soil covered by tide waters within the State, Chief Justice Waite saying: "The principle has long been settled in this court, that each State owns the beds of all tide waters within its jurisdiction, unless they have been granted away. In like manner, the States own the tide waters themselves, and the fish in them, so far as they are capable of ownership while running. For this purpose the State represents its people, and the ownership is that of the people in their united sovereignty. The title thus held is subject to the paramount right of navigation, the regulation of which, in respect to foreign and interstate commerce, has been granted to the United States." *McCready* v. *Virginia*, 94 U. S. 391, 394. In Virginia, by virtue of statutes

beginning in 1679, the owner of land bounded by tide waters has the title to ordinary low water mark, and the right to build wharves, provided they do not obstruct navigation. 5 Opinions of Attorneys General, 412, 435–440; *French* v. *Bankhead*, 11 Grattan, 136, 159–161; *Hardy* v. *McCullough*, 23 Grattan, 251, 262; *Norfolk* v. *Cooke*, 27 Grattan, 430, 434, 435; *Garrison* v. *Hall*, 75 Virginia, 150.

In North Carolina, when not otherwise provided by statute, the private ownership of land bounded by navigable waters stops at high water mark, and the land between high and low water mark belongs to the State, and may be granted by it. *Hatfield* v. *Grimstead*, 7 Iredell, 139; *Lewis* v. *Keeling*, 1 Jones, (No. Car.) 299, 306. The statutes of that State, at different periods, have either limited grants of land, bounded on navigable waters, to high water mark; or have permitted owners of the shore to make entries of the land in front, as far as deep water, for the purpose of a wharf; and any owner of the shore appears to have the right to wharf out, subject to such regulations as the legislature may prescribe for the protection of the public rights of navigation and fishery. *Wilson* v. *Forbes*, 2 Dev. 30; *Collins* v. *Benbury*, 3 Iredell, 277, and 5 Iredell, 118; *Gregory* v. *Forbes*, 96 No. Car. 77; *State* v. *Narrows Island Club*, 100 No. Car. 477; *Bond* v. *Wool*, 107 No. Car. 139.

In South Carolina, the rules of the common law, by which the title in the land under tide waters is in the State, and a grant of land bounded by such waters passes no title below high water mark, appear to be still in force. *State* v. *Pacific Guano Co.*, 22 So. Car. 50; *State* v. *Pinckney*, 22 So. Car. 484.

In Georgia, also, the rules of the common law would seem to be in force as to tide waters, except as affected by statutes of the State providing that "the right of the owner of lands adjacent to navigable streams extends to low water mark in the bed of the stream." Georgia Code of 1882, §§ 962, 2229, 2230; *Howard* v. *Ingersoll*, 13 How. 381, 411, 421; *Alabama* v. *Georgia*, 23 How. 505; *Savannah* v. *State*, 4 Georgia, 26, 39; *Young* v. *Harrison*, 6 Georgia, 130, 141.

The foregoing summary of the laws of the original States shows that there is no universal and uniform law upon the subject; but that each State has dealt with the lands under the tide waters within its borders according to its own views of justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public. Great caution, therefore, is necessary in applying precedents in one State to cases arising in another.

IV. The new States admitted into the Union since the adoption of the Constitution have the same rights as the original States in the tide waters, and in the lands below the high water mark, within their respective jurisdictions.

The act of 1783 and the deed of 1784, by which the State of Virginia, before the adoption of the Constitution, ceded "unto the United States in Congress assembled, for the benefit of the said States, all right, title and claim, as well of soil as jurisdiction," to the Northwest Territory, and the similar cession by the State of Georgia to the United States in 1802 of territory including great part of Alabama and of Mississippi, each provided that the territory so ceded should be formed into States, to be admitted, on attaining a certain population, into the Union, (in the words of the Virginia cession) "having the same rights of sovereignty, freedom and independence as the other States," or (in the words of the Ordinance of Congress of July 13, 1787, for the government of the Northwest Territory, adopted in the Georgia cession) "on an equal footing with the original States in all respects whatever;" and that "all the lands within" the territory so ceded to the United States, and not reserved or appropriated for other purposes, should be considered as a common fund for the use and benefit of the United States. Charters and Constitutions, 427, 428, 432, 433; Clayton's Laws of Georgia, pp. 48–51; Acts of Congress of April 7, 1798, c. 28; 1 Stat. 549; May 10, 1800, c. 50, and March 3, 1803, c. 27; 2 Stat. 69, 229; *Pollard* v. *Hagan*, 3 How. 212, 221, 222.

In *Pollard* v. *Hagan*, (1844,) this court, upon full con-

sideration, (overruling anything to the contrary in *Pollard* v. *Kibbe,* 14 Pet. 353; *Mobile* v. *Eslava,* 16 Pet. 234; *Mobile* v. *Hallett,* 16 Pet. 261; *Mobile* v. *Emanuel,* 1 How. 95; and *Pollard* v. *Files,* 2 How. 591,) adjudged that upon the admission of the State of Alabama into the Union, the title in the lands below high water mark of navigable waters passed to the State, and could not afterwards be granted away by the Congress of the United States. Mr. Justice McKinley, delivering the opinion of the court, (Mr. Justice Catron alone dissenting,) said: "We think a proper examination of this subject will show, that the United States never held any municipal sovereignty, jurisdiction or right of soil, in. and to the territory of which Alabama or any of the new States were formed; except for temporary purposes, and to execute the trusts created by the acts of the Virginia and Georgia legislatures, and the deeds of cession executed by them to the United States, and the trust created by the treaty with the French Republic of the 30th of April, 1803, ceding Louisiana." "When the United States accepted the cession of the territory, they took upon themselves the trust to hold the municipal eminent domain for the new States, and to invest them with it to the same extent, in all respects, that it was held by the States ceding the territories." "When Alabama was admitted into the Union, on an equal footing with the original States, she succeeded to all the rights of sovereignty, jurisdiction and eminent domain, which Georgia possessed at the date of the cession, except so far as this right was diminished by the public lands remaining in the possession and under the control of the United States, for the temporary purposes provided for in the deed of cession and the legislative acts connected with it. Nothing remained to the United States, according to the terms of the agreement, but the public lands." 3 How. 221–223. "Alabama is therefore entitled to the sovereignty and jurisdiction over all the territory within her limits, subject to the common law, to the same extent that Georgia possessed it before she ceded it to the United States. To maintain any other doctrine is to deny that Alabama has been admitted into the Union on an equal footing with the

original States, the Constitution, laws and compact to the contrary notwithstanding." "Then to Alabama belong the navigable waters, and soils under them, in controversy in this case, subject to the rights surrendered by the Constitution to the United States." 3 How. 228, 229.

So much of the reasoning of the learned justice, as implied that the title in the land below high water mark could not have been granted away by the United States after the deed of cession of the territory and before the admission of the State into the Union, was not necessary to the decision, which involved only a grant made by Congress after the admission of Alabama, and which was followed in two similar cases in which Congress, after the admission of the State, had undertaken to confirm Spanish grants, made after the Treaty of San Ildefonso of 1800, and therefore passing no title whatever. *Goodtitle* v. *Kibbe*, (1850,) 9 How. 471; *Hallett* v. *Beebe*, (1851,) 13 How. 25. In the first of these cases, Chief Justice Taney, speaking for the whole court, of which Mr. Justice McKinley was still a member, said: " Undoubtedly Congress might have granted this land to the patentee, or confirmed his Spanish grant, before Alabama became a State. But this was not done. And the existence of this imperfect and inoperative Spanish grant could not enlarge the power of the United States over the place in question after Alabama became a State, nor authorize the general government to grant or confirm a title to land when the sovereignty and dominion over it had become vested in the State." 9 How. 478.

V. That these decisions do not, as contended by the learned counsel for the plaintiff in error, rest solely upon the terms of the deed of cession from the State of Georgia to the United States, clearly appears from the constant recognition of the same doctrine as applicable to California, which was acquired from Mexico by the Treaty of Guadalupe Hidalgo of 1848. 9 Stat. 926; *United States* v. *Pacheco*, (1864,) 2 Wall. 587; *Mumford* v. *Wardwell*, (1867,) 6 Wall. 423; *Weber* v. *Harbor Commissioners*, (1874,) 18 Wall. 57; *Packer* v. *Bird*, (1891,) 137 U. S. 661, 666; *San Francisco* v. *Le Roy*, (1891,) 138 U. S. 656, 671; *Knight* v. *United States Land Association*, (1891,) 142 U. S. 161.

In *United States* v. *Pacheco*, it was decided that a grant
from the Mexican government, confirmed by a decree of a
court of the United States under authority of Congress, of
land bounded " by the bay " of San Francisco, did not include
land below ordinary high water mark of the bay; because,
as was said by Mr. Justice Field, in delivering judgment, " By
the common law, the shore of the sea, and, of course, of arms
of the sea, is the land between ordinary high and low water
mark, the land over which the daily tides ebb and flow.
When, therefore, the sea, or a bay, is named as a boundary,
the line of ordinary high water mark is always intended whefe
the common law prevails. And there is nothing in the lan-.
guage of the decree which requires the adoption of any other
rule in the present case. If reference be had to the rule of
the civil law, because the bay is given as a boundary in the
grant from the Mexican government, the result will be equally
against the position of the appellants." 2 Wall. 590.

The State of California was admitted into the Union in
1850, and within a year afterwards passed statutes, declaring
that a certain line designated upon a recorded plan should
"be and remain a permanent water front" of the city of
San Francisco; reserving to the State "its right to regulate
the construction of wharves or other improvements, so that
they shall not interfere with the shipping and commercial
interests of the bay and harbor;" and providing that the city
might construct wharves at the end of all the streets com-
mencing with the bay, not exceeding two hundred yards be-
yond that line, and that the spaces beyond, between the
wharves, should remain free from obstructions and be used as
public slips. In *Weber* v. *Harbor Commissioners*, it was held
that a person afterwards acquiring the title of the city in a
lot and wharf below high water mark had no right to com-
plain of works constructed by commissioners of the State,
under authority of the legislature, for the protection of the
harbor and the convenience of shipping, in front of his wharf,
and preventing the approach of vessels to it; and Mr. Justice
Field, in delivering judgment, said : " Although the title to
the soil under the tide waters of the bay was acquired by the

United States by cession from Mexico, equally with the title
to the upland, they held it only in trust for the future State.
Upon the admission of California into the Union upon equal
footing with the original States, absolute property in, and
dominion and sovereignty over, all soils under the tide waters
within her limits passed to the State, with the consequent
right to dispose of the title to any part of said soils in such
manner as she might deem proper, subject only to the para-
mount right of navigation over the waters, so far as such
navigation might be required by the necessities of commerce
with foreign nations or among the several States, the regula-
tion of which was vested in the general government." 18
Wall. 65, 66.

In the very recent case of *Knight* v. *United States Land
Association*, Mr. Justice Lamar, in delivering judgment, said :
" It is the settled rule of law in this court that absolute prop-
erty in, and dominion and sovereignty over, the soils under the
tide waters in the original States were reserved to the several
States ; and that the new States since admitted have the same
rights, sovereignty and jurisdiction in that behalf, as the orig-
inal States possess within their respective borders. Upon the
acquisition of the territory from Mexico, the United States
acquired the title to tide lands, equally with the title to upland ;
but with respect to the former they held it only in trust for
the future States that might be erected out of such territory."
142 U. S. 183. In support of these propositions he referred to
*Martin* v. *Waddell*, *Pollard* v. *Hagan*, *Mumford* v. *Wardwell*,
and *Weber* v. *Harbor Commissioners*, above cited.

In that case, it was further held, as it had previously been
declared in *San Francisco* v. *Le Roy*, above cited, that " this
doctrine does not apply to lands that had been previously
granted to other parties by the former government, or sub-
jected to trusts which would require their disposition in some
other way ; " and that when the United States acquired
California from Mexico by the treaty, they were bound by its
stipulations, and by the principles of international law, to
protect all rights of property acquired under previous lawful
grants from the Mexican government. 142 U. S. 183, 184.

And it was therefore adjudged that under a boundary "by the bay," in the Mexican grant of the pueblo of San Francisco, duly confirmed by a decree of a court of the United States, and defined by a survey under the authority of the Secretary of the Interior as following the general line of high water mark of the bay, crossing the mouth of a tide water creek, the title of lands inside of that line, although below high water mark of the creek, was included, and therefore did not pass by a deed from the State.

VI. The decisions of this court, referred to at the bar, regarding the shores of waters where the ebb and flow of the tide from the sea is not felt, but which are really navigable, should be considered with reference to the facts upon which they were made, and keeping in mind the local laws of the different States, as well as the provisions of the acts of Congress relating to such waters.

By the law of England, Scotland and Ireland, the owners of the banks *prima facie* own the beds of all fresh water rivers above the ebb and flow of the tide, even if actually navigable, to the thread of the stream, *usque ad filum aquæ.* Lord Hale, in Hargrave's Law Tracts, 5; *Bickett* v. *Morris,* L. R. 1 H. L. Sc. 47; *Murphy* v. *Ryan,* Ir. R. 2 C. L. 143; *Orr Ewing* v. *Colquhoun,* 2 App. Cas. 839.

The rule of the common law on this point appears to have been followed in all the original States — except in Pennsylvania, Virginia and North Carolina, and except as to great rivers such as the Hudson, the Mohawk and the St. Lawrence in New York — as well as in Ohio, Illinois, Michigan and Wisconsin. But it has been wholly rejected, as to rivers navigable in fact, in Pennsylvania, Virginia and North Carolina, and in most of the new States. For a full collection and careful analysis of the cases, see Gould on Waters, (2d ed.) §§ 56–78.

The earliest judicial statement of the now prevailing doctrine in this country as to the title in the soil of rivers really navigable, although above the ebb and flow of the tide, is to be found in a case involving the claim of a riparian proprietor to an exclusive fishery in the Susquehanna River, in which

Chief Justice Tilghman in 1807, after observing that the rule of the common law upon the subject had not been adopted in Pennsylvania, said : "The common law principle is, in fact, that the owners of the banks have no right to the water of navigable rivers. Now the Susquehanna is a navigable river, and therefore the owners of its banks have no such right. It is said, however, that some of the cases assert that by navigable rivers are meant rivers in which there is no flow or reflow of the tide. This definition may be very proper in England, where there is no river of considerable importance as to navigation, which has not a flow of the tide; but it would be highly unreasonable when applied to our large rivers, such as the Ohio, Allegheny, Delaware, Schuylkill, or Susquehanna and its branches." *Carson* v. *Blazer*, 2 Binney, 475, 477, 478.

It was because of this difference in the law of Pennsylvania from that of England and of most of the older States, and because the decisions of the Supreme Court of Pennsylvania upon the subject were deemed binding precedents, that this court, speaking by Mr. Justice Grier, held that riparian owners, erecting dams on navigable rivers in Pennsylvania, did so only by license from the State, revocable at its pleasure, and could therefore claim no compensation for injuries caused to such dams by subsequent improvements under authority of the State for the convenience of navigation; and also that by the law of Pennsylvania preëmption rights to islands in such rivers could not be obtained by settlement. *Rundle* v. *Delaware & Raritan Canal*, (1852,) 14 How. 80, 91, 93, 94; *Fisher* v. *Haldeman*, (1857,) 20 How. 186, 194.

By the acts of Congress for the sale of the public lands, those lands are to be divided into townships, six miles square, unless the line of an Indian reservation, or of land previously surveyed and patented, or "the course of navigable rivers, may render it impracticable," and into sections and quarter sections, bounded by north and south and east and west lines, running to the corners, or, when the corners cannot be fixed, then, "to the watercourse," "or other external boundary;" and it is provided "that all navigable rivers within the territory to be disposed of by virtue of this act shall be deemed to

be and remain public highways; and that in all cases where the opposite banks of any stream not navigable shall belong to different persons, the stream and the bed thereof shall be common to both." Acts of May 18, 1796, c. 29, §§ 2, 9 ; 1 Stat. 464 ; May 10, 1800, c. 55, § 3; March 3, 1803, c. 27, § 17; March 26, 1804, c. 35, § 6 ; February 11, 1805, c. 14 ; 2 Stat. 73, 235, 279, 313 ; Rev. Stat. §§ 2395, 2396, 2476.

Those acts also provide that when, in the opinion of the President, " a departure from the ordinary method of surveying land on any river, lake, bayou or watercourse, would promote the public interest," the land may be surveyed and sold in tracts of two acres in width, fronting on any such water, and running back the depth of forty acres. Act of May 24, 1844, c. 141 ; 4 Stat. 34 ; Rev. Stat. § 2407.

By the Ordinance of 1787 for the government of the Northwest Territory, "the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said Territory as to the citizens of the United States, and those of any other States that may be admitted into the confederacy." Charters and Constitutions, 432 ; Act of August 7, 1789, c. 8 ; 1 Stat. 50. And the acts relating to the Territories of Louisiana and Missouri contained similar provisions. Acts of March 3, 1811, c. 46, § 12 ; June 4, 1812, c. 95, § 15 ; 2 Stat. 666, 747.

In the acts for the admission of the States of Louisiana and Mississippi into the Union, it was likewise declared that "the river Mississippi, and the navigable rivers and waters leading into the same, or into the Gulf of Mexico, shall be common highways, and forever free, as well to the inhabitants of the said State, as to other citizens of the United States." Acts of February 20, 1811, c. 21, § 3 ; April 8, 1812, c. 50, § 1 ; 2 Stat. 642, 703 ; March 1, 1817, c. 23, § 4 ; 3 Stat. 349.

In *Withers* v. *Buckley*, (1857,) 20 How. 84, this court, affirming the judgment of the highest court of Mississippi in 29 Mississippi, 21, held that this did not prevent the legislature of the State from improving by a canal the navigation of one of those navigable rivers, and thereby diverting without

compensation the flow of water by the plaintiff's land; and Mr. Justice Daniel, in delivering judgment, said: "It cannot be imputed to Congress that they ever designed to forbid, or to withhold from the State of Mississippi, the power of improving the interior of that State, by means either of roads or canals, or by regulating the rivers within its territorial limits, although a plan of improvement to be adopted might embrace or affect the course or the flow of rivers situated within the interior of the State. Could such an intention be ascribed to Congress, the right to enforce it may be confidently denied. Clearly, Congress could exact of the new State the surrender of no attribute inherent in her character as a sovereign independent State, or indispensable to her equality with her sister States, necessarily implied and guaranteed by the very nature of the Federal compact. Obviously, and it may be said primarily, among the incidents of that equality is the right to make improvements in the rivers, watercourses and highways, situated within the State." 20 How. 93. See also *Willamette Bridge Co.* v. *Hatch,* 125 U. S. 1, 9–12; *Monongahela Co.* v. *United States,* 148 U. S. 312, 329–333.

In *The Genesee Chief,* (1851,) 12 How. 443, in which this court, overruling its earlier decisions, held that the admiralty and maritime jurisdiction of the courts of the United States extended to all public navigable waters, although above the flow of the tide from the sea, Chief Justice Taney, taking the same line of argument as Chief Justice Tilghman in *Carson* v. *Blazer,* above cited, said that in England, where there were no navigable streams beyond the ebb and flow of the tide, the description of the admiralty jurisdiction as confined to tide waters was a reasonable and convenient one, and was equivalent to saying that it was confined to public navigable waters; but that, when the same description was used in this country, "the description of a public navigable river was substituted in the place of the thing intended to be described; and, under the natural influence of precedents and established forms, a definition originally correct was adhered to and acted on, after it had ceased, from a change in circum-

stances, to be the true description of public waters." 12 How. 454, 455.

In *Jones* v. *Soulard*, (1860,) 24 How. 41, the decision was that a title acquired under the act of June 13, 1812, c. 99, (2 Stat. 748,) to land in St. Louis, bounded by the Mississippi River, included an island west of the middle of the river, then only a sand bar, covered at ordinary high water and surrounded on all sides by navigable water, but which, after the admission of Missouri into the Union as a State, became, by the gradual filling up of the island and the intervening channel, connected with the shore as fast land. Mr. Justice Catron, indeed, in delivering the opinion, spoke of the rule of the common law, that "all grants of land bounded by fresh water rivers, where the expressions designating the water line are general, confer the proprietorship on the grantee to the middle thread of the stream and entitle him to the accretions," as a general and well settled rule, and applicable to the Mississippi River. 24 How. 65. But, as stated in that opinion, the charter of the city of St. Louis extended to the eastern boundary of the State of Missouri in the middle of the Mississippi River. By the law of Missouri, as theretofore declared by its Supreme Court, the title of lands bounded by the Mississippi River extended to low water mark and included accretions. *O'Fallon* v. *Price*, 4 Missouri, 343; *Shelton* v. *Maupin*, 16 Missouri, 124; *Smith* v. *St. Louis Schools*, 30 Missouri, 290. And the only question in *Jones* v. *Soulard* was of the title, not in the bed or shore of the river, but only in accretions which had become part of the fast land.

The rule, everywhere admitted, that where the land encroaches upon the water by gradual and imperceptible degrees, the accretion or alluvion belongs to the owner of the land, is equally applicable to lands bounding on tide waters or on fresh waters, and to the King or the State as to private persons; and is independent of the law governing the title in the soil covered by the water. Lord Hale, in Hargrave's Law Tracts, 5, 14, 28; *Rex* v. *Yarborough*, in the King's Bench, 3 B. & C. 91, and 4 D. & R. 790, and in the

House of Lords, 1 Dow & Clark, 178, 2 Bligh N. R. 147, and 5 Bing. 163; *Doe* v. *East India Co.*, 10 Moore P. C. 140; *Foster* v. *Wright*, 4 C. P. D. 438; *Handly* v. *Anthony*, 5 Wheat. 374, 380; *Jefferis* v. *East Omaha Co.*, 134 U. S. 178, 189–193; *Nebraska* v. *Iowa*, 143 U. S. 359; *Minto* v. *Delaney*, 7 Oregon, 337.

Again, in *St. Clair* v. *Lovingston*, (1874,) 23 Wall. 46, the right of a riparian proprietor in St. Louis, which was upheld by this court, affirming the judgment of the Supreme Court of Illinois in 64 Illinois, 56, and which Mr. Justice Swayne, in delivering the opinion, spoke of as resting in the law of nature, was the right to alluvion or increase of the upland by gradual and imperceptible degrees. And, as if to prevent any possible inference that the decision might affect the title in the soil under the water, the learned justice, after quoting the opinion in *Jones* v. *Soulard*, above cited, expressly reserved the expression of any opinion upon the question whether the limit of the land was low water or the middle thread of the river; and repeated the propositions established by the earlier decisions of this court, already referred to: "By the American Revolution, the people of each State, in their sovereign character, acquired the absolute right to all their navigable waters and the soil under them. The shores of navigable waters and the soil under them were not granted by the Constitution to the United States, but were reserved to the States respectively. And new States have the same rights of sovereignty and jurisdiction over this subject as the original ones." 23 Wall. 64, 68.

Some passages in the opinions in *Dutton* v. *Strong*, (1861,) 1 Black, 23; *Railroad Co.* v. *Schurmeir*, (1868,) 7 Wall. 272; and *Yates* v. *Milwaukee*, (1870,) 10 Wall. 497, were relied on by the learned counsel for the plaintiff in error, as showing that the owner of land adjoining any navigable water, whether within or above the ebb and flow of the tide, has, independently of local law, a right of property in the soil below high water mark, and the right to build out wharves so far, at least, as to reach water really navigable.

But the remarks of Mr. Justice Clifford in the first of those

cases, upon which his own remarks in the second case and those of Mr. Justice Miller in the third case were based, distinctly recognized the diversity of laws and usages in the different States upon this subject; and went no further than to say that wharves, piers and landing places, " where they conform to the regulations of the State " and do not extend below low water mark, have never been held to be nuisances, unless they obstruct the paramount right of navigation; that the right of the riparian proprietor to erect such structures in the navigable waters of the Atlantic States has been claimed, exercised and sanctioned from the first settlement of the country to the present time; that "different States adopted different regulations upon the subject, and in some, the right of the riparian proprietor rests upon immemorial local usage;" and that "no reason is perceived why the same general principle should not be applicable to the lakes," so far as to permit the owner of the adjacent land to build out as far as where the water first becomes deep enough to be navigable. 1 Black, 31, 32. And none of the three cases called for the laying down or defining of any general rule, independent of local law or usage, or of the particular facts before the court.

In *Dutton* v. *Strong*, the defendants, being the owners and occupants of a pier extending into Lake Michigan at Racine in the State of Wisconsin, were sued for cutting the hawser by which the plaintiffs had fastened their vessel to the pier during a storm, in consequence of which she was driven, by the force of the wind and waves, against another pier, and injured. And, as stated in the opinion, the pier appeared to be the private property of the defendants, constructed for their own use; there was no evidence that it constituted any obstruction whatever to the public right of navigation; the plaintiffs' vessel was made fast to it by her master without any authority from the defendants, either express or implied; and, under the increasing strain of the hawser by the storm, the piles of the pier began to give way before the hawser was cut. The only point adjudged was that, the plaintiffs' vessel having been wrongfully attached to the pier, the defendants, after she had been requested and had refused to leave, had

the right to cut her loose, if necessary to preserve the pier from destruction or injury. 1 Black, 33, 34. There can be no doubt of the correctness of that decision; for, even if the pier had been unlawfully erected by the defendants as against the State, the plaintiffs had no right to pull it down or injure it, and upon the facts of the case were mere trespassers upon the defendants' possession. *Linthicum* v. *Ray*, 9 Wall. 241; *Wetmore* v. *Brooklyn Gaslight Co.*, 42 N. Y. 384; *Harrington* v. *Edwards*, 17 Wisconsin, 604; *Johnson* v. *Barret*, Aleyn, 10, 11.

In *Railroad Co.* v. *Schurmeir*, the plaintiff claimed title to lots in a block in the city of St. Paul and State of Minnesota under a patent from the United States of a fractional section, bounded on one side by the Mississippi River. At the place in question there was a small island, lying along the shore of the river, about four feet lower than the mainland, and separated from it by a channel or slough twenty-eight feet wide, in which at very low water there was no current, and very little water, and that standing in pools; at a medium stage of the water the island was not covered, and there was a current or flow through the channel or slough; and at very high water the island was submerged. In the original government survey, the meander lines were run along the mainland of the shore, the quantity of land was estimated accordingly, and the island and intervening space were not shown or mentioned. That island and space were afterwards filled up by the city as a landing place, and were claimed by the railroad company under a subsequent survey and grant from the United States. The island, therefore, was connected with the mainland by a space substantially uncovered at low water; and the improvements complained of did not extend beyond high water mark of the island. The question in controversy was whether the plaintiff's patent was limited by the main shore, or extended to the outside of the island. The Supreme Court of Minnesota held that, by the law of Minnesota, land bounded by a navigable river extended to low water mark, at least, if not to the thread of the river; and that the plaintiff's title therefore extended to the water's edge at low

water mark and included the island, and gave judgment for
the plaintiff.  10 Minnesota, 82. `This court affirmed the
judgment, saying: "Express decision of the Supreme Court
of the State was, that the river, in this case, and not the
meander line, is the west boundary of the lot, and in that con-
clusion of the state court we entirely concur.  Meander lines
are run in surveying fractional portions of the public lands
bordering upon navigable rivers, not as boundaries of the
tract, but for the purpose of defining the sinuosities of the
banks of the stream, and as the means of ascertaining
the quantity of land in the fraction subject to sale, and which
is to be paid for by the purchaser.  In preparing the official
plat from the field notes, the meander line is represented as
the border line of the stream, and shows, to a demonstration,
that the watercourse, and not the meander line as actually
run on the land, is the boundary." 7 Wall. 286, 287.  The
court also expressed an unhesitating opinion that " Congress,
in making a distinction between streams navigable and those
not navigable, intended to provide that the common law rules
of riparian ownership should apply to lands bordering on the
latter, but that the title to lands bordering on navigable
streams should stop at the stream, and that all such streams
should be deemed to be and remain public highways."  And
the court treated it as too plain for discussion, that the island,
separated from the mainland only by a depression in which
at low water there was no continuous flow or line of water,
was included in the first survey, and therefore not affected by
the subsequent survey.  7 Wall. 288, 289.

In *Yates* v. *Milwaukee*, the material facts appear by the
report to have been as follows: The owner of a lot fronting
on a river in the city of Milwaukee and State of Wisconsin
had built, upon land covered by water of no use for the pur-
pose of navigation, a wharf extending to the navigable chan-
nel of the river.  There was no evidence that the wharf was
an obstruction to navigation, or was in any sense a nuisance.
The city council afterwards, under a statute of the State,
enacted before the wharf was built, authorizing the city coun-
cil to establish dock and wharf lines upon the banks of the

river, to restrain and prevent encroachments upon and obstruc-
tions to the river, and to cause the river to be dredged, passed
an ordinance declaring this wharf to be an obstruction to
navigation and a nuisance, and ordering it to be abated.  The
point adjudged was that the mere declaration of the city
council that the wharf already built and owned by the plain-
tiff was a nuisance did not make it such, or subject it to be
removed by authority of the city.  It was recognized in the
opinion that by the law of Wisconsin, established by the deci-
sions of its Supreme Court, the title of the owner of land
bounded by a navigable river extended to the centre of the
stream, subject, of course, to the public right of navigation.
*Jones* v. *Pettibone,* 2 Wisconsin, 308; *Walker* v. *Shepardson,*
2 Wisconsin, 384, and 4 Wisconsin, 486; *Mariner* v. *Schulte,*
13 Wisconsin, 692; *Arnold* v. *Elmore,* 16 Wisconsin, 536.
See also *Olson* v. *Merrill,* 42 Wisconsin, 203; *Norcross* v.
*Griffiths,* 65 Wisconsin, 599.  And the only decision of that
court, which this court considered itself not bound to follow,
was *Yates* v. *Judd,* 18 Wisconsin, 118, upon the question of
fact whether certain evidence was sufficient to prove a dedi-
cation to the public.   10 Wall. 504–506.

VII. The later judgments of this court clearly establish
that the title and rights of riparian or littoral proprietors in
the soil below high water mark of navigable waters are gov-
erned by the local laws of the several States, subject, of course,
to the rights granted to the United States by the Constitution.

In *Weber* v. *Harbor Commissioners,* above cited, Mr. Justice
Field, in delivering judgment, while recognizing the correctness
of the doctrine "that a riparian proprietor, whose land is
bounded by a navigable stream, has the right of access to the
navigable part of the stream in front of his land, and to con-
struct a wharf or pier projecting into the stream, for his own
use, or the use of others, subject to such general rules and
regulations as the legislature may prescribe for the protection
of the public," and admitting that in several of the States, by
general legislation or immemorial usage, the proprietor of
land bounded by the shore of the sea, or of an arm of the sea,
has a right to wharf out to the point where the waters are

navigable, said: "In the absence of such legislation or usage, however, the common law rule would govern the rights of the proprietor, at least in those States where the common law obtains. By that law, the title to the shore of the sea, and of the arms of the sea, and in the soils under tide waters is, in England, in the King, and, in this country, in the State. Any erection thereon without license is, therefore, deemed an encroachment upon the property of the sovereign, or, as it is termed in the language of the law, a purpresture, which he may remove at pleasure, whether it tends to obstruct navigation or otherwise." 18 Wall. 64, 65.

In *Atlee* v. *Packet Co.,* (1874,) 21 Wall. 389, which arose in Iowa in 1871, Mr. Justice Miller, in delivering judgment, after referring to *Dutton* v. *Strong, Railroad Co.* v. *Schurmeir,* and *Yates* v. *Milwaukee,* above cited, disclaimed laying down any invariable rule as to the extent to which wharves and landing places might be built out into navigable waters by private individuals or municipal corporations; and recognized that a State might, by its legislation, or by authority expressly or impliedly delegated to municipal governments, control the construction, erection and use of such wharves or landings, so as to secure their safety and usefulness, and to prevent their being obstructions to navigation. 21 Wall. 392, 393. And it was adjudged, following in this respect the opinion of the Circuit Court in 2 Dillon, 479, that a riparian proprietor had no right, without statutory authority, to build out piers into the Mississippi River as necessary parts of a boom to receive and retain logs until needed for sawing at his mill by the water side.

In *Railway Co.* v. *Renwick,* (1880,) 102 U. S. 180, affirming the judgment of the Supreme Court of Iowa in 49 Iowa, 664, it was by virtue of an express statute passed by the legislature of Iowa in 1874, that the owner of a similar pier and boom recovered compensation for the obstruction of access to it from the river by the construction of a railroad in front of it.

In *Barney* v. *Keokuk,* (1876,) 94 U. S. 324, the owner, under a grant from the United States, of two lots of land in

the city of Keokuk and State of Iowa, bounded by the Mississippi River, brought an action of ejectment against the city and several railroad companies and a steamboat company to recover possession of lands below high water mark in front of his lots, which the city, pursuant to statutes of the State, had filled up as a wharf and levee, and had permitted to be occupied by the railroads and landing places of those companies. The plaintiff's counsel relied on *Dutton* v. *Strong*, *Railroad Co.* v. *Schurmeir* and *Yates* v. *Milwaukee*, above cited. 94 U. S. 329, 331. But this court, affirming the judgment of the Circuit Court of the United States, held that the action could not be maintained; and Mr. Justice Bradley, in delivering judgment, summed up the law upon the subject with characteristic power and precision, saying: "It appears to be the settled law of that State that the title of the riparian proprietors on the banks of the Mississippi extends only to ordinary high water mark, and that the shore between high and low water mark, as well as the bed of the river, belongs to the State. This is also the common law with regard to navigable waters; although, in England, no waters are deemed navigable except those in which the tide ebbs and flows. In this country, as a general thing, all waters are deemed navigable which are really so; and especially is it true with regard to the Mississippi and its principal branches. The question as to the extent of the riparian title was elaborately discussed in the case of *McManus* v. *Carmichael*, 3 Iowa, 1. The above conclusion was reached, and has always been adhered to in that State. *Haight* v. *Keokuk*, 4 Iowa, 199; *Tomlin* v. *Dubuque &c. Railroad*, 32 Iowa, 106." "It is generally conceded that the riparian title attaches to subsequent accretions to the land, effected by the gradual and imperceptible operation of natural causes. But whether it attaches to land reclaimed by artificial means from the bed of the river, or to sudden accretions produced by unusual floods, is a question which each State decides for itself. By the common law, as before remarked, such additions to the land on navigable waters belong to the Crown; but, as the only waters recognized in

England as navigable were tide waters, the rule was often expressed as applicable to tide waters only, although the reason of the rule would equally apply to navigable waters above the flow of the tide; that reason being that the public authorities ought to have entire control of the great passageways of commerce and navigation, to be exercised for the public advantage and convenience. The confusion of navigable with tide water, found in the monuments of the common law, long prevailed in this country, notwithstanding the broad differences existing between the extent and topography of the British island and that of the American continent. It had the influence for two generations of excluding the admiralty jurisdiction from our great rivers and inland seas; and under the like influence it laid the foundation in many States of doctrines, with regard to the ownership of the soil in navigable waters above tide water, at variance with sound principles of public policy. Whether, as rules of property, it would now be safe to change these doctrines where they have been applied, as before remarked, is for the several States themselves to determine. If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections. In our view of the subject, the correct principles were laid down in *Martin* v. *Waddell*, 16 Pet. 367; *Pollard* v. *Hagan*, 3 How. 212; and *Goodtitle* v. *Kibbe*, 9 How. 471. These cases related to tide water, it is true; but they enunciate principles which are equally applicable to all navigable waters. And since this court, in the case of *The Genesee Chief*, 12 How. 443, has declared that the Great Lakes and other navigable waters of the country, above as well as below the flow of the tide, are, in the strictest sense, entitled to the denomination of navigable waters, and amenable to the admiralty jurisdiction, there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. It properly belongs to the States by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its survey and grants beyond

the limits of high water. The cases in which this court has seemed to hold a contrary view depended, as most cases must depend, on the local laws of the States in which the lands were situated. In Iowa, as before stated, the more correct rule seems to have been adopted after a most elaborate investigation of the subject." 94 U. S. 336–338.

In *St. Louis* v. *Myers*, (1885,) 113 U. S. 566, the court, speaking by Chief Justice Waite, held that the act of Congress for the admission into the Union of the State of Missouri, bounded by the Mississippi River, which declared that the river should be "a common highway and forever free," left the rights of riparian owners to be settled according to the principles of state law; and that no Federal question was involved in a judgment of the Supreme Court of the State of Missouri as to the right of a riparian proprietor in the city of St. Louis to maintain an action against the city for extending one of its streets into the river so as to divert the natural course of the water and thereby to injure his property.

In *Packer* v. *Bird*, (1891,) 137 U. S. 661, the general rules governing this class of cases were clearly and succinctly laid down by the court, speaking by Mr. Justice Field, as follows: "The courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the States for their grants; but whatever incidents or rights attach to the ownership of property conveyed by the government will be determined by the States, subject to the condition that their rules do not impair the efficacy of the grants, or the use and enjoyment of the property by the grantee. As an incident of such ownership, the right of the riparian owner, where the waters are above the influence of the tide, will be limited according to the law of the State, either to low or high water mark, or will extend to the middle of the stream." 137 U. S. 669, 670. And it was accordingly held, affirming the judgment of the Supreme Court of California in 71 California, 134, and referring to the opinion in *Barney* v. *Keokuk*, above cited, as specially applicable to the case, that a person holding land under a patent from the United States, confirming a Mexican grant bounded by the

Sacramento River, which was navigable in fact, took no title below the high water mark, either under the acts of Congress or by the local law.

In *St. Louis* v. *Rutz*, (1891,) 138 U. S. 226, the court, speaking by Mr. Justice Blatchford, and referring to *Barney* v. *Keokuk*, *St. Louis* v. *Myers* and *Packer* v. *Bird*, above cited, said: "The question as to whether the fee of the plaintiff, as a riparian proprietor on the Mississippi River, extends to the middle thread of the stream, or only to the water's edge, is a question in regard to a rule of property, which is governed by the local law of Illinois." And it was because " the Supreme Court of Illinois has established and steadily maintained, as a rule of property, that the fee of the riparian owner of lands in Illinois bordering on the Mississippi River extends to the middle line of the main channel of that river," that it was decided that a deed of land in Illinois, bounded by the Mississippi River, passed the title in fee in the bed of the river to the middle line of the main channel, and to all islands found in the bed of the river east of the middle of that channel; and, "that being so, it is impossible for the owner of an island which is situated on the west side of the middle of the river, and in the State of Missouri, to extend his ownership, by mere accretion, to land situated in the State of Illinois, the title in fee to which is vested by the law of Illinois in the riparian owner of the land in that State." 138 U. S. 242, 250.

In the recent case of *Hardin* v. *Jordan*, (1891,) 140 U. S. 371, in which there was a difference of opinion upon the question whether a survey and patent of the United States, bounded by a lake which was not navigable, in the State of Illinois, was limited by the margin, or extended to the centre of the lake, all the justices agreed that the question must be determined by the law of Illinois. Mr. Justice Bradley, speaking for the majority of the court, and referring to many cases already cited above, said: "With regard to grants of the government for lands bordering on tide water, it has been distinctly settled that they only extend to high water mark, and that the title to the shore and lands under water in front of lands so granted enures to the State within which they are

situated, if a State has been organized and established there. Such title to the shore and lands under water is regarded as incidental to the sovereignty of the State — a portion of the royalties belonging thereto, and held in trust for the public purposes of navigation and fishery — and cannot be retained or granted out to individuals by the United States. Such title being in the State, the lands are subject to state regulation and control, under the condition, however, of not interfering with the regulations which may be made by Congress with regard to public navigation and commerce. The State may even dispose of the usufruct of such lands, as is frequently done by leasing oyster beds in them, and granting fisheries in particular localities; also, by the reclamation of submerged flats, and the erection of wharves and piers and other adventitious aids of commerce. Sometimes large areas so reclaimed are occupied by cities, and are put to other public or private uses, state control and ownership therein being supreme, subject only to the paramount authority of Congress in making regulations of commerce, and in subjecting the lands to the necessities and uses of commerce. This right of the States to regulate and control the shores of tide waters and the land under them is the same as that which is exercised by the Crown in England. In this country the same rule has been extended to our great navigable lakes, which are treated as inland seas; and also, in some of the States, to navigable rivers, as the Mississippi, the Missouri, the Ohio, and, in Pennsylvania, to all the permanent rivers of the State; but it depends on the law of each State to what waters and to what extent this prerogative of the State over the lands under water shall be exercised." 140 U. S. 381, 382. And Mr. Justice Brewer, in beginning the dissenting opinion, said: " Beyond all dispute, the settled law of this court, established by repeated decisions, is that the question how far the title of a riparian owner extends is one of local law. For a determination of that question the statutes of the State and the decisions of its highest court furnished the best and the final authority." 140 U. S. 402.

In the yet more recent case of *Illinois Central Railroad* v.

*Illinois,* (1892,) which also arose in Illinois, it was recognized as the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, or navigable lakes, within the limits of the several States, belong to the respective States within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in such waters, and subject to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce. 146 U. S. 387, 435–437, 465, 474.

VIII. Notwithstanding the *dicta* contained in some of the opinions of this court, already quoted, to the effect that Congress has no power to grant any land below high water mark of navigable waters in a Territory of the United States, it is evident that this is not strictly true.

Chief Justice Taney, in delivering an opinion already cited, after the subject had been much considered in the cases from Alabama, said : " Undoubtedly Congress might have granted this land to the patentee, or confirmed his Spanish grant, before Alabama became a State." *Goodtitle* v. *Kibbe,* 9 How. 471, 478. In the cases from California, already referred to, the question whether a Mexican grant, confirmed by the United States, did or did not include any lands below high water mark, was treated as depending on the terms of the decree of confirmation by a court of the United States under authority of Congress. By the application of that test, no such lands were held to be included in *United States* v. *Pacheco,* 2 Wall. 587, and some such lands were held to be included in *Knight* v. *United States Land Association,* 142 U. S. 161. And in *Packer* v. *Bird,* 137 U. S. 661, 672, Mr. Justice Field, speaking for the court, after referring to the rule, as stated in *Railroad Co.* v. *Schurmeir,* 7 Wall. 272, 288, above quoted, that Congress, by the provisions of the land laws, intended that the title to lands bordering on navigable streams should stop at the stream, said : " The same rule applies when the survey is made and the patent is issued upon a confirmation of a previously existing right or equity of the

patentee to the lands, which in the absence of such right or equity would belong absolutely to the United States, unless the claim confirmed in terms embraces the land under the waters of the stream."

By the Constitution, as is now well settled, the United States, having rightfully acquired the Territories, and being the only government which can impose laws upon them, have the entire dominion and sovereignty, national and municipal, Federal and state, over all the Territories, so long as they remain in a territorial condition. *American Ins. Co.* v. *Canter*, 1 Pet. 511, 542; *Benner* v. *Porter*, 9 How. 235, 242; *Cross* v. *Harrison*, 16 How. 164, 193; *National Bank* v. *Yankton County*, 101 U. S. 129, 133; *Murphy* v. *Ramsey*, 114 U. S. 15, 44; *Mormon Church* v. *United States*, 136 U. S. 1, 42, 43; *McAllister* v. *United States*, 141 U. S. 174, 181.

We cannot doubt, therefore, that Congress has the power to make grants of lands below high water mark of navigable waters in any Territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several States, or to carry out other public purposes appropriate to the objects for which the United States hold the Territory.

IX. But Congress has never undertaken by general laws to dispose of such lands. And the reasons are not far to seek.

As has been seen, by the law of England, the title in fee, or *jus privatum*, of the King or his grantee was, in the phrase of Lord Hale, "charged with and subject to that *jus publicum* which belongs to the King's subjects," or, as he elsewhere puts it, "is clothed and superinduced with a *jus publicum*, wherein both natives and foreigners in peace with this kingdom are interested by reason of common commerce, trade and intercourse." Hargrave's Law Tracts, 36, 84. In the words of Chief Justice Taney, "the country" discovered and settled by Englishmen "was held by the King in his public and regal character as the representative of the nation, and in trust for

them;" and the title and the dominion of the tide waters and of the soil under them, in each colony, passed by the royal charter to the grantees as "a trust for the common use of the new community about to be established;" and, upon the American Revolution, vested absolutely in the people of each State "for their own common use, subject only to the rights since surrendered by the Constitution to the general government." *Martin* v. *Waddell*, 16 Pet. 367, 409–411. As observed by Mr. Justice Curtis, "This soil is held by the State, not only subject to, but in some sense in trust for, the enjoyment of certain public rights." *Smith* v. *Maryland*, 18 How. 71, 74. The title to the shore and lands under tide water, said Mr. Justice Bradley, "is regarded as incidental to the sovereignty of the State — a portion of the royalties belonging thereto, and held in trust for the public purposes of navigation and fishery." *Hardin* v. *Jordan*, 140 U. S. 371, 381. And the Territories acquired by Congress, whether by deed of cession from the original States, or by treaty with a foreign country, are held with the object, as soon as their population and condition justify it, of being admitted into the Union as States, upon an equal footing with the original States in all respects; and the title and dominion of the tide waters and the lands under them are held by the United States for the benefit of the whole people, and, as this court has often said, in cases above cited, "in trust for the future States." *Pollard* v. *Hagan*, 3 How. 212, 221, 222; *Weber* v. *Harbor Commissioners*, 18 Wall. 57, 65; *Knight* v. *United States Land Association*, 142 U. S. 161, 183.

The Congress of the United States, in disposing of the public lands, has constantly acted upon the theory that those lands, whether in the interior, or on the coast, above high water mark, may be taken up by actual occupants, in order to encourage the settlement of the country; but that the navigable waters and the soils under them, whether within or above the ebb and flow of the tide, shall be and remain public highways; and, being chiefly valuable for the public purposes of commerce, navigation and fishery, and for the improvements necessary to secure and promote those purposes,

shall not be granted away during the period of territorial government; but, unless in case of some international duty or public exigency, shall be held by the United States in trust for the future States, and shall vest in the several States, when organized and admitted into the Union, with all the powers and prerogatives appertaining to the older States in regard to such waters and soils within their respective jurisdictions; in short, shall not be disposed of piecemeal to individuals as private property, but shall be held as a whole for the purpose of being ultimately administered and dealt with for the public benefit by the State, after it shall have become a completely organized community.

X. The title of the United States to Oregon was founded upon original discovery and actual settlement by citizens of the United States, authorized or approved by the government of the United States; as well as upon the cession of the Louisiana Territory by France in the treaty of 1803, and the renunciation of the claims of Spain in the treaty of 1819. American State Papers, 6 Foreign Relations, 666; Barrow's History of Oregon, c. 22; 8 Stat. 202, 256. While the right to Oregon was in contest between the United States and Great Britain, the citizens of the one and the subjects of the other were permitted to occupy it under the Conventions of 1818 and 1827. 8 Stat. 249, 360. Its boundary on the north was defined by the treaty with Great Britain of June 15, 1846. 9 Stat. 869. So far as the title of the United States was derived from France or Spain, it stood as in other territories acquired by treaty. The independent title based on discovery and settlement was equally absolute. *Johnson* v. *McIntosh*, 8 Wheat. 543, 595; *Martin* v. *Waddell*, 16 Pet. 367, 409; *Jones* v. *United States*, 137 U. S. 202, 212.

By the act of 1848, establishing the territorial government of Oregon, "all laws heretofore passed in said Territory, making grants of land, or otherwise affecting or incumbering the title to lands," were declared to be void; and the laws of the United States were "extended over and declared to be in force in said Territory, so far as the same, or any provision thereof, may be applicable." Act of August 14, 1848, c. 177,

§ 14; 9 Stat. 329. The land laws adopted by the provisional government of Oregon, established by the people while the sovereignty was in dispute between the United States and Great Britain, regulated the occupation only. The settlers had no title in the soil. The United States, on assuming undisputed dominion over the Territory, owned all the lands therein; and Congress had the right to confine its bounties to settlers within just such limits as it chose. The provisions of the general land laws of the United States were not applicable to the Oregon Territory. And before 1850 there was no statute under which any one could acquire a legal title from the United States to lands in Oregon. *Lownsdale* v. *Parrish*, 21 How. 290, 293; *Stark* v. *Starrs*, 6 Wall. 402; *Davenport* v. *Lamb*, 13 Wall. 418, 429, 430; *Lamb* v. *Davenport*, 18 Wall. 307, 314; *Stark* v. *Starr*, 94 U. S. 477, 486; *Barney* v. *Dolph*, 97 U. S. 652, 654; *Hall* v. *Russell*, 101 U. S. 503, 507, 508; *Missionary Society* v. *Dalles*, 107 U. S. 336, 344.

The first act of Congress which granted to settlers titles in such lands was the Oregon Donation Act of September 27, 1850, c. 76. That act required the lands in Oregon to be surveyed as in the Northwest Territory; and it made grants or donations of land, measured by sections, half sections and quarter sections, to actual settlers and occupants. It contains nothing indicating any intention on the part of Congress to depart from its settled policy of not granting to individuals lands under tide waters or navigable rivers. 9 Stat. 496; Rev. Stat. §§ 2395, 2396, 2409.

It is evident, therefore, that a donation claim under this act, bounded by the Columbia River, where the tide ebbs and flows, did not, of its own force, have the effect of passing any title in lands below high water mark. Nor is any such effect attributed to it by the law of the State of Oregon.

The southern part of the Territory of Oregon was admitted into the Union as the State of Oregon, "on an equal footing with the other States in all respects whatever," by the act of February 14, 1859, c. 33; and the act of admission provided that "the said State of Oregon shall have concurrent jurisdiction on the Columbia and all other rivers and waters bordering

on the said State of Oregon, so far as the same shall form a common boundary to said State and any other State or States now or hereafter to be formed or bounded by the same; and said rivers and waters, and all the navigable waters of said State, shall be common highways and forever free, as well to the inhabitants of said State as to all other citizens of the United States." 11 Stat. 383.

The settlers of Oregon, like the colonists of the Atlantic States, coming from a country in which the common law prevailed to one that had no organized government, took with them, as their birthright, the principles of the common law, so far as suited to their condition in their new home. The jurisprudence of Oregon, therefore, is based on the common law. *Van Ness* v. *Pacard*, 2 Pet. 137, 144; *Norris* v. *Harris*, 15 California, 226, 252; *Cressey* v. *Tatom*, 9 Oregon, 541; *Lamb* v. *Starr*, Deady, 350, 358.

By the law of the State of Oregon, as declared and established by the decisions of its Supreme Court, the owner of upland bounding on navigable water has no title in the adjoining lands below high water mark, and no right to build wharves thereon, except as expressly permitted by statutes of the State; but the State has the title in those lands, and, unless they have been so built upon with its permission, the right to sell and convey them to any one, free of any right in the proprietor of the upland, and subject only to the paramount right of navigation inherent in the public. *Hinman* v. *Warren*, 6 Oregon, 408; *Parker* v. *Taylor*, 7 Oregon, 435; *Parker* v. *Rogers*, 8 Oregon, 183; *Shively* v. *Parker*, 9 Oregon, 500; *McCann* v. *Oregon Railway*, 13 Oregon, 455; *Bowlby* v. *Shively*, 22 Oregon, 410. See also *Shively* v. *Welch*, 10 Sawyer, 136, 140, 141.

In the case at bar, the lands in controversy are below high water mark of the Columbia River where the tide ebbs and flows; and the plaintiff in error claims them by a deed from John M. Shively, who, while Oregon was a Territory, obtained from the United States a donation claim, bounded by the Columbia River, at the place in question.

The defendants in error claim title to the lands in controversy by deeds executed in behalf of the State of Oregon, by

a board of commissioners, pursuant to a statute of the State of 1872, as amended by a statute of 1874, which recited that the annual encroachments of the sea upon the land, washing away the shores and shoaling harbors, could be prevented only at great expense by occupying and placing improvements upon the tide and overflowed lands belonging to the State, and that it was desirable to offer facilities and encouragement to the owners of the soil abutting on such harbors to make such improvements; and therefore enacted that the owner of any land abutting or fronting upon, or bounded by the shore of any tide waters, should have the right to purchase the lands belonging to the State in front thereof; and that, if he should not do so within three years from the date of the act, they should be open to purchase by any other person who was a citizen and resident of Oregon, after giving notice and opportunity to the owner of the adjoining upland to purchase; and made provisions for securing to persons who had actually made improvements upon tide lands a priority of right so to purchase them.

Neither the plaintiff in error nor his grantor appears to have ever built a wharf or made any other improvement upon the lands in controversy, or to have applied to the State to purchase them. But the defendants in error, after their purchase from the State, built and maintained a wharf upon the part of these lands nearest the channel, which extended several hundred feet into the Columbia River, and at which ocean and river craft were wont to receive and discharge freight.

The theory and effect of these statutes were stated by the Supreme Court of the State, in this case, as follows: "Upon the admission of the State into the Union, the tide lands became the property of the State, and subject to its jurisdiction and disposal. In pursuance of this power, the State provided for the sale and disposal of its tide lands by the act of 1872 and the amendments of 1874 and 1876. Laws 1872, p. 129; Laws 1874, p. 77; Laws 1876, p. 70. By virtue of these acts, the owner or owners of any land abutting or fronting upon or bounded by the shore of the Pacific Ocean, or of any bay, harbor or inlet of the same, and rivers and their bays in which the tide ebbs

and flows, within this State, were given the right to purchase all the tide lands belonging to the State, in front of the lands so owned, within a certain time and upon conditions prescribed; and providing further that in case such owner or owners did not apply for the purchase of such tide lands, or, having applied, failed to prosecute the same as provided by law, then that such tide lands shall be open to purchase by any other person who is a resident and citizen of the State of Oregon; but in consideration of the fact that prior to 1872, as it would seem, these lands had been dealt with as private property, and sometimes improved by expensive structures, the acts further provided, in such cases, that where the bank owners had actually sold the tide lands, then the purchaser of the tide land from the bank owner, or a previous bank owner, should have the right to purchase from the State. These statutes are based on the idea that the State is the owner of the tide lands, and has the right to dispose of them; that there are no rights of upland ownership to interfere with this power to dispose of them and convey private interests therein, except such as the State saw fit to give the adjacent owners, and to acknowledge in them and their grantees when they had dealt with such tide lands as private property, subject, of course, to the paramount right of navigation secured to the public. These statutes have been largely acted upon, and many titles acquired under them to tide lands. In the various questions relating to tide lands which have come before the judiciary, the validity of these statutes has been recognized and taken for granted, though not directly passed upon." 22 Oregon, 415, 416.

The substance and scope of the earlier statute of Oregon of October 14, 1862, (General Laws of 1862, p. 96; Hill's Code of Oregon, §§ 4227, 4228;) which is copied in the margin,[1]

---

[1] An Act to authorize the owners of land lying upon a navigable stream or other like water to build wharves into such stream or other water, beyond the line of low water mark.

Be it enacted by the Legislative Assembly of the State of Oregon, as follows:

SEC. 1. The owner of any land in this State, lying upon any navigable stream or other like water, and within the corporate limits of any incorpo-

were stated by that court as follows: " It is true, the legislature of this State had made provision by which the upland owner within the corporate limits of any incorporated town might build wharves, prior to the acts of 1872 and 1874, *supra ;* but within the purview of our adjudications it would, as a matter of power, have been equally competent to have given this privilege to others. But this act is not a grant. It simply authorizes upland owners on navigable rivers within the corporate limits of any incorporated town to construct wharves in front of their land. It does not vest any right until exercised. It is a license, revocable at the pleasure of the legislature until acted upon or availed of. Shively did not avail himself of the license, nor is there any pretence to that effect. The plaintiffs have built a wharf upon and in front of their tide land. If the act is as applicable to tide lands as uplands on navigable waters, they have exercised the right." 22 Oregon, 420, 421.

Upon a review of its prior decisions, the court was of opinion that by the law of Oregon, in accordance with the law as formerly held in New York in *Gould* v. *Hudson River Railroad,* 6 N. Y. 522; with the law of New Jersey, as declared in *Stevens* v. *Paterson & Newark Railroad,* 5 Vroom, (34 N. J. Law,) 532, and recognized in *Hoboken* v. *Pennsylvania Railroad,* 124 U. S. 656; and with the law of the State of

---

rated town therein, is hereby authorized to construct a wharf or wharves upon the same, and extend such wharf or wharves into such stream or other like water, beyond low water mark, so far as may be necessary and convenient for the use and accommodation of any ships or other boats or vessels that may or can navigate such stream or other like water.

SEC. 2. The corporate authorities of the town, wherein such wharf or wharves is proposed to be constructed, shall have power to regulate the exercise of the privilege or franchise herein granted; and, upon the application of the person entitled to and desiring to construct such wharf or wharves, such corporate authorities shall by ordinance, or other like mode, prescribe the mode and extent to which the same may be exercised beyond the line of low water mark, so that such wharf or wharves shall not be constructed any farther into such stream or other water beyond such low water line than may be necessary and convenient for the purpose expressed in the first section of this act, and so that the same will not unnecessarily interfere with the navigation of such stream or other like water.

Washington, on the other side of the Columbia River, as declared in *Eisenbach* v. *Hatfield,* 2 Wash. St. 236; and upon the principles affirmed in decisions of this court, above cited, and especially in *Hardin* v. *Jordan,* 140 U. S. 371, 382; the authority conferred by the statutes of Oregon upon upland owners on navigable rivers to construct wharves in front of their land did not vest any right until exercised, but was a mere license revocable at the pleasure of the legislature until acted upon; and that the State had the right to dispose of its tide lands free from any easement of the upland owner.

The court thus stated its final conclusion : " From all this it appears that when the State of Oregon was admitted into the Union, the tide lands became its property and subject to its jurisdiction and disposal; that in the absence of legislation or usage, the common-law rule would govern the rights of the upland proprietor, and by that law the title to them is in the State ; that the State has the right to dispose of them in such manner as she might deem proper, as is frequently done in various ways, and whereby sometimes large areas are reclaimed and occupied by cities, and are put to public and private uses, state control and ownership therein being supreme, subject only to the paramount right of navigation and commerce. The whole question is for the State to determine for itself; it can say to what extent it will preserve its rights of ownership in them, or confer them on others. Our State has done that by the legislation already referred to; and our courts have declared its absolute property in and dominion over the tide lands, and its right to dispose of its title in such manner as it might deem best, unaffected by any 'legal obligation to recognize the rights of either the riparian owners, or those who had occupied such tide lands,' other than it chose to resign to them, subject only to the paramount right of navigation and the uses of commerce. From these considerations it results, if we are to be bound by the previous adjudications of this court, which have become a rule of property, and upon the faith of which important rights and titles have become vested, and large expenditures have been made and incurred, that the defendants have no rights or interests in the lands in question.

Upon this point there is no diversity of judgment among us. We all think that the law as adjudicated ought not to be disturbed, independent of other reasons and authorities suggested in its support." 22 Oregon, 427.

By the law of the State of Oregon, therefore, as enacted by its legislature and declared by its highest court, the title in the lands in controversy is in the defendants in error; and, upon the principles recognized and affirmed by a uniform series of recent decisioฺs of this court, above referred to, the law of Oregon governs the case.

The conclusions from the considerations and authorities above stated may be summed up as follows:

Lands under tide waters are incapable of cultivation or improvement in the manner of lands above high water mark. They are of great value to the public for the purposes of commerce, navigation and fishery. Their improvement by individuals, when. permitted, is incidental or subordinate to the public use and right. Therefore the title and the control of them are vested in the sovereign for the benefit of the whole people.

At common law, the title and the dominion in lands flowed by the tide were in the King for the benefit of the nation. Upon the settlement of the Colonies, like rights passed to the grantees in the royal charters, in trust for the communities to be established. Upon the American Revolution, these rights, charged with a like trust, were vested in the original States within their respective borders, subject to the rights surrendered by the Constitution to the United States.

Upon the acquisition of a Territory by the United States, whether by cession from one of the States, or by treaty with a foreign country, or by discovery and settlement, the same title and dominion passed to the United States, for the benefit of the whole people, and in trust for the several States to be ultimately created out of the Territory.

The new States admitted into the Union since the adoption of the Constitution have the same rights as the original States in the tide waters, and in the lands under them, within their respective jurisdictions. The title and rights of riparian or

littoral proprietors in the soil below high water mark, therefore, are governed by the laws of the several States, subject to the rights granted to the United States by the Constitution.

The United States, while they hold the country as a Territory, having all the powers both of national and of municipal government, may grant, for appropriate purposes, titles or rights in the soil below high water mark of tide waters. But they have never done so by general laws; and, unless in some case of international duty or public exigency, have acted upon the policy, as most in accordance with the interest of the people and with the object for which the Territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters, and in the soil under them, to the control of the States, respectively, when organized and admitted into the Union.

Grants by Congress of portions of the public lands within a Territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high water mark, and do not impair the title and dominion of the future State when created; but leave the question of the use of the shores by the owners of uplands to the sovereign control of each State, subject only to the rights vested by the Constitution in the United States.

The donation land claim, bounded by the Columbia River, upon which the plaintiff in error relies, includes no title or right in the land below high water mark; and the statutes of Oregon, under which the defendants in error hold, are a constitutional and legal exercise by the State of Oregon of its dominion over the lands under navigable waters.

*Judgment affirmed.*